IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SAM CONSIGLIO,

Plaintiff, CIV S-05-1701 GEB GGH P

vs.

JEANNE WOODFORD, Director of the California Department of Corrections,

Defendants.

ORDER &

FINDINGS AND RECOMMENDATIONS

/

The court, by separate order, has now found plaintiff's amended complaint, filed on September 13, 2005, appropriate for service.[1] By order filed on September 2, 2005, the court construed plaintiff's letter, filed on September 1, 2005, as a motion for a temporary restraining order (TRO), wherein plaintiff threatened to commit suicide should an anticipated immediate transfer from Mule Creek State Prison (MCSP) occur before he received treatment for painful injuries from which he has claimed to be suffering. The undersigned directed a response within ten days from the only defendant, Jeanne Woodford, named in plaintiff's original complaint, against whom this court found plaintiff's claims colorable.[2] The undersigned also ordered both

[1] Plaintiff's original complaint was filed on August 24, 2005 upon transfer of this case from the Northern District.

[2] Plaintiff's amended complaint names nine defendants, including Jeanne Woodford.

the Attorney General and defendant Woodford to "take any steps necessary to contact prison authorities and staff at Mule Creek State Prison to monitor plaintiff in light of his suicide threat." See Order, filed on September 2, 2005. Defendant's response was filed timely.

In his amended complaint, plaintiff alleges that in January 2000, he suffered a serious knee injury in the prison laundry that has never been treated properly. First Amended Complaint (FAC), p. 3. Due to the defendants' deliberate indifference to, and long delay in treating, this serious injury, plaintiff now needs an artificial joint replacement in that knee. Id.

In November of 2001, plaintiff suffered a serious back injury in the prison laundry while at work, which has never been properly treated primarily because defendant Hernandez, Warden at R. J. Donovan Correctional Facility, had plaintiff transferred "illegally" in 2004 despite a medical hold placed on plaintiff. FAC, p. 4. The transfer was in retaliation for plaintiff's having exposed the physical and sexual abuse of mentally ill inmates. Id. Defendant Hernandez placed plaintiff in administrative segregation for over three months on false charges that were never adjudicated and had plaintiff transferred without a hearing in violation of due process. Id.

On April 15, 2002, plaintiff sustained a third injury in the prison laundry, tearing the rotator cuff in his right shoulder, an injury which has never been treated. Defendant Dr. Bradley Williams, a doctor at Doctor's Hospital at Manteca, under contract with Mule Creek State Prison (MCSP), delayed, and ultimately denied, treatment, ordering in the interim costly and unnecessary tests. Id.

Following plaintiff's "illegal" transfer, on January 26, 2004, to Folsom State Prison, he was transferred by the end of March, 2004 to CMC-E, a "supposed" medical treatment facility, when authorities at Folsom realized how much medical treatment plaintiff needed. Id. Defendant Marshall, Warden of CMC-E, had plaintiff transferred "illegally" to MCSP on August 11, 2004, by "falsifying" a CDC 1845 form. Id.

\\\\\

In the year plaintiff has been transferred to MCSP, plaintiff has received constant threats of a retaliatory transfer for continuing to complain about not receiving adequate medical care. Id. As of August 2005, five surgical procedures have been approved and scheduled for plaintiff. Id. On August 2, 2005, when plaintiff appeared before the Unit Classification Committee (UCC), he was told he would remain at MCSP for another year; shortly thereafter, defendants Arnold, Reyes, Smith and Brett Williams "decided to get rid of plaintiff" despite his pending surgical procedures. Id. Defendant Campbell, Warden of MCSP, has failed to protect plaintiff from this retaliatory action. Id. The anticipated transfer is also an effort by MCSP to avoid spending the $100,000 cost for all of plaintiff's surgeries. Id. Defendant Woodford has approved all of plaintiff's transfers. FAC, p. 5. Plaintiff seeks both injunctive relief and monetary damages.

Motion for Temporary Restraining Order (TRO)

In the letter to which defendant Woodford has filed a response, plaintiff seeks a TRO against defendant Warden Campbell to stop plaintiff's immediate impending transfer from MCSP without having received medical treatment for the injuries which cause him excruciating pain. See, letter filed in this court on September 1, 2005.[3] Plaintiff claims he will end his life if he is transferred, that he has endured four transfers in 18 months and that the transfers are based on a desire by MCSP officials to avoid covering the cost of his surgeries. Id.

In a subsequent letter directed to Judge Karlton, filed on September 2, 2005, plaintiff makes the same complaint, adding that he has been suffering for five and a half years. In yet another letter to the undersigned, filed in this court on September 6, 2005, plaintiff restates the urgency of his need, stating that he will either be killed by staff or end his life once he has been transferred.

\\\\\

[3] At the time this letter was filed, plaintiff had not named Warden Campbell as a defendant, but she is named in the now operative first amended complaint.

In a later letter to the court, filed in this court on September 9, 2005, plaintiff states that on the morning of September 7, 2005, the UCC had ordered his transfer to Salinas Valley State Prison (SVSP), despite his pending scheduled and approved surgeries and despite this court's order filed September 2, 2005. According to plaintiff, an unidentified captain stated: "I don't care about any federal court order, I run this yard." See, 9/9/05 letter. Plaintiff includes a copy of a notice of classification hearing, dated August 19, 2005, indicating that plaintiff was being scheduled to appear before the UCC for "transfer consideration to SVSP." Exhibit to 9/9/05 letter. Plaintiff states that a psychologist named Dr. White "is doing all he can to stop this transfer...." See, 9/9/05 letter. Plaintiff avers that Dr. White sent a memo recommending strongly that plaintiff not be transferred due to his medical status. Id. In this letter, plaintiff claims to be in a "desperate" situation but says he is "not suicidal," although he also adds that he can no longer live with the pain. Id. Plaintiff asks for the court to appoint particular counsel for him, Jane Kahn, of Rosen, Bien and Asara;[4] he also claims to have been imprisoned for 14 years for crimes he "absolutely did not commit." Id.

In the September 13, 2005 filing, wherein plaintiff files, inter alia, his amended complaint, plaintiff says again that Dr. White, who is the chief psychologist, submitted a memorandum urging that plaintiff not be transferred until plaintiff's injuries are treated. Filing of 9/13/05. Plaintiff states that Dr. White "has been going out of his way to help [plaintiff]." Id. According to plaintiff, Dr. White has told him he would testify in court or by phone that staff should not have attempted a transfer of plaintiff under the circumstances. Id. Plaintiff, however, does not include a copy of the Dr. White's memo or any declaration from him among the exhibits he submits.

Apparently as background, plaintiff adds that before he was transferred to Folsom, he was transferred to Chino, and repeats some of the allegations of his first amended complaint.

[4] By separate order, the court has directed that the King Hall Civil Rights Clinic review plaintiff's case and consider appointment as voluntary counsel.

Id. Plaintiff claims that upon transfer it takes a year to have medical procedures re-scheduled. Id. Plaintiff alleges that keeping him transit is the way the state can avoid paying for his surgeries and that he is a Level II inmate but he is being sent to another Level III facility. Id.

Finally, seeking to clarify earlier assertions, plaintiff states that when an unidentified captain told him that staff would use a taser if necessary to transfer him, that is what plaintiff meant would kill him because he has a serious heart condition. Id. Plaintiff appears to be backpedaling somewhat when he states: “Yes, I have been contemplating suicide, but not here at MCSP. With people like Dr. White, that will never happen here.” Id. Plaintiff avers that his problem is not mental, but rather the unbearable physical pain he suffers. Plaintiff states that he has begun having epidural injections and has had one in a series of three, a series that will take six months. Id. He is also awaiting knee and shoulder surgery and a colonscopy. Id. Plaintiff claims to urgently need an injunction so that his medical care will go forward. Id.

Plaintiff includes an exhibit demonstrating that he has been issued a medical chrono in the past for his medical condition, assigning him to a lower bunk and lower tier, and allowing him a cane and an extra mattress. See chrono, dated 9/1/04, Exhibits filed on 9/13/05. In a chrono due to have just ended on 9/16/05, plaintiff was assigned to a lower bunk and restricted in his duties and movements. See chrono, dated 9/11/04, Exhibits filed on 9/13/05. In the same chrono, the doctor found that plaintiff did not meet the criteria of the Armstrong Remedial Plan and that an 1845 was not warranted. Id.

In plaintiff’s C-file it is noted by a Dr. Choo on November 21, 2002, that he is undergoing treatment for three injuries, to his left knee, back and right shoulder, which occurred in his laundry job. See Exhibits filed on 9/13/05. The same physician in a chrono dated March 7, 2003, notes plaintiff was undergoing “orthopedic and neurosurgical evaluation for a rotator cuff tear and spinal stenosis,” and states that “he should be placed on a medical hold for the next six months,” due to expire on September 10, 2003. Id. In a chrono from another physician, Dr. Jenkins, dated August 18, 2003, the surgeon states that plaintiff “is undergoing neurosurgical

evaluation for spinal stenosis" and "should be placed on medical hold for 6 months...." Id.

In a letter from the "Prison Law Office" in San Quentin, dated August 5, 2005, plaintiff's epidural injection on July 14, 2005 is referenced and it is noted that another was requested on August 4, 2005; no evidence of an imminent transfer is found, but it is also set forth that a Dr. Galloway stated that the current medical treatment would not require a medical hold. Id. A Physician's Assistant (Todd) in a health care services request dated July 26, 2005, notes that a B. Williams (now a defendant) recommended shoulder surgery for a rotator cuff torn three years earlier and notes a confirming MRI (magnetic resonance imaging) on 11/5/04. Id. Physician's Assistant Todd, on July 27 or 29, 2005, also notes that since March of 2003 a procedure was recommended but not completed. Id. On 8/4/05, a second epidural was requested by a physician, noting the good result of an earlier epidural in July of 2005. Id.

On May 21, 2004, a Dr. Stevig signed a disability placement program verification, indicating, inter alia, that plaintiff has a mobility impairment. Id. Plaintiff includes MRI reports of the tear in his right shoulder rotator cuff, dated September 6, 2002 and November 5, 2004. Id.

Physician's Assistant Todd responded at the first level to a 4/30/05 reasonable modification/accommodation request by plaintiff for his medical problems, stating that plaintiff had had an MRI on his left knee on January 31, 2005. 9/13/05 Additional Exhibits. Plaintiff is told that he is at intermediate risk for surgery when evaluated for cardiac clearance, and that he is scheduled to see (defendant) Dr. Williams for pre-op for cardiac clearance review for his shoulder surgery. Id. A precise date cannot be given for "security reasons." Id. Plaintiff's shoulder surgery has priority so his knee and back surgeries have not been recommended. Id. Plaintiff's request is deemed partially granted. Plaintiff, however, deems the response false, in his second level appeal on July 2, 2005, because defendant Dr. Williams told him on June 29, 2005, that his contract expired and he could not do the surgery. Id. Plaintiff also complains that an epidural had been ordered 16 weeks earlier. Id. (Apparently, plaintiff received the first epidural, as noted on, July 14, 2005).

Defendant Woodford's Response

Defendant Woodford's counsel avers that defendant is exploring the best options for plaintiff's medical and mental health needs "consistent with custody considerations." Response, p. 2. Defendant intends to supplement her response by September 23, 2005. Id. Counsel declares that upon receipt of this court's September 2, 2005 order, Deputy Attorney General Constance L. Picciano immediately alerted MCSP medical staff of the need to evaluate plaintiff in light of his suicide threat. Declaration of Jodie A. Schwab, ¶ 2. MCSP Chief Psychologist, Jeff White, evaluated plaintiff on September 2, 2005, determining that he was not suicidal on that date. Id., ¶ 3. (The court observes that in the representations of the parties there is some conflict in the position that Dr. White has allegedly taken as to whether or not plaintiff should be transferred). On September 5, 2005,[5] counsel, upon assignment to the case, contacted MCSP Litigation Coordinator Earl Kanipe and was informed that plaintiff had been evaluated by mental health and found not to be suicidal at present. Counsel attaches a chrono (attachment A) from the UCC hearing on September 7, 2005 (referenced by plaintiff above), wherein a recommendation was made for plaintiff's transfer to SVSP "so as to address his medical needs," in counsel's words. Id., ¶ 5.

On September 7, 2005, a psychologist, Dr. K. Powell, reviewed plaintiff's file to re-assess his mental health needs, also determining that he was not presently suicidal, but nevertheless placing him in the CCCMS program to be monitored and re-evaluated at least once weekly. Id., ¶ 6.

On September 8, 2005, defendant's counsel reviewed plaintiff's file at MCSP and spoke with T. Weinhold, the medical return coordinator at MCSP, the individual responsible for finding medical providers for medical procedures approved by the Medical Review Committee for inmates and scheduling the procedures. Id., ¶ 7. Medical providers must be contractually

[5] Counsel inadvertently states the year as 2006.

approved and willing to perform a procedure. Id. On December 21, 2004, Weinhold had scheduled and arranged transport for plaintiff for an MRI of his left knee. Id. According to what Weinhold told defendant's counsel, she had to cancel the appointment upon being informed by transport that plaintiff refused the transport. Id. Weinhold told counsel that she also had scheduled appointments with Dr. Zheng in Manteca to address plaintiff's low back pain; Dr. Zheng recommended an epidural steroid injection (ESI) for plaintiff's low back pain on July 14, 2005, and plaintiff was scheduled to return for a second ESI in mid-September. Id. Plaintiff was also referred to her after the Medical Review Committee approved his right shoulder surgery, and has since been working to find a medical provider to perform the shoulder surgery. Id. Counsel does not say how long Weinhold has been looking.

Defendant's counsel provides some relevant background information. On September 22, 2004, plaintiff was referred to (now defendant) Dr. Bradley Williams,[6] an orthopedic surgeon at Doctor's Hospital in Manteca. Id. Defendant Bradley Williams ordered an MRI of plaintiff's right shoulder; plaintiff returned to see him on October 13, 2004 for his shoulder injury and to have his left knee examined. Id. On that date, defendant Bradley Williams gave plaintiff a steroid injection in his knee; an MRI thereafter completed revealed a rotator cuff tear in plaintiff's right shoulder. Id. Defendant Bradley Williams upon reviewing the MRI, before recommending surgery, due to plaintiff's history of myocardial infarctions, required plaintiff to see a cardiologist to be cleared for shoulder surgery. Id. Weinhold then informed counsel that she then scheduled an appointment for plaintiff with a cardiologist, Dr. Baluyat, at Doctor's Hospital in Modesto and Manteca, who has limited availability and was unable to see plaintiff to clear him for surgery until June 20, 2005. Id.

Defendant Bradley Williams, thereafter, on June 29, 2005, recommended the shoulder surgery but informed Weinhold that he would not be able to do it because, as of July 1,

---

[6] Because plaintiff has named two defendants named Dr. B. Williams, the court must distinguish them by full first name.

2005, he would not be under contract with the state as a medical provider for inmates. Id. Weinhold then contacted a medical provider at Queen of the Valley Hospital in the Napa area, to see if Dr. Schifflet, an orthopedic surgeon, would see plaintiff, but she was informed on August 15, 2005, that he would not do so. Id.

On August 31, 2005, Weinhold contacted UC Davis Medical Center to see if they would see plaintiff, who have since informed her that they would see plaintiff for a shoulder consultation; however, MCSP Litigation Coordinator Earl Kanipe has been informed, according to counsel, that UC Davis Med Center would not be able to schedule the consultation to evaluate the shoulder until March 27, 2006. Id., §§ 7-8.

Counsel for defendant then concedes that plaintiff "has several orthopedic health concerns that need to be addressed," but asserts that scheduling has proven very difficult since plaintiff has been housed at MCSP. Id., ¶ 9. Counsel has been "informed" that SVSP has an orthopedic doctor under contract who can see plaintiff. Id., ¶ 10. Counsel goes on to state that she has been informed that "plaintiff's counselor" recommended transfer because plaintiff can be more appropriately housed at SVSP, where his medical needs, she believes, can be better addressed. Id., ¶ 11. Counsel intends to update the court as to plaintiff's status within five court days, or by September 23, 2005 (five court days from the filing of the September 16, 2005 response). Id., ¶ 13.

TRO

The purpose in issuing a temporary restraining order is to preserve the status quo pending a fuller hearing. The cases contain limited discussion of the standards for issuing a temporary restraining order due to the fact that very few such orders can be appealed prior to the hearing on a preliminary injunction. It is apparent, however, that requests for temporary restraining orders which are not ex parte and without notice are governed by the same general standards that govern the issuance of a preliminary injunction. See New Motor Vehicle Bd. v. Orrin W. Fox Co., 434 U.S. 1345, 1347 n.2 (1977) (Rehnquist, J.); Los Angeles Unified Sch.

Dist. v. United States Dist. Court, 650 F.2d 1004, 1008 (9th Cir. 1981) (Ferguson, J. dissenting); Century Time Ltd. v. Interchron Ltd., 729 F. Supp. 366, 368 (S.D.N.Y. 1990).  In many cases the emphasis of the court is directed to irreparable harm and the balance of hardships because the merits of a controversy are often difficult to ascertain and adjudicate on short notice.

Preliminary Injunction Standard

The legal principles applicable to a request for preliminary injunctive relief are well established. "The traditional equitable criteria for granting preliminary injunctive relief are: 1) a strong likelihood of success on the merits, 2) the possibility of irreparable injury to plaintiff if the preliminary relief is not granted, 3) a balance of hardships favoring the plaintiff, and 4) advancement of the public interest (in certain cases)." Dollar Rent A Car v. Travelers Indem. Co., 774 F.2d 1371, 1374 (9th Cir. 1985).  The criteria are traditionally treated as alternative tests. "Alternatively, a court may issue a preliminary injunction if the moving party demonstrates 'either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor.'" Martin v. International Olympic Comm., 740 F.2d 670, 675 (9th Cir. 1984) (quoting William Inglis & Sons Baking Co. v. ITT Continental Baking Co., 526 F.2d 86, 88 (9th Cir. 1975)).  The Ninth Circuit has reiterated that under either formulation of the principles, if the probability of success on the merits is low, preliminary injunctive relief should be denied:

> Martin explicitly teaches that "[u]nder this last part of the alternative test, even if the balance of hardships tips decidedly in favor of the moving party, it must be shown as an irreducible minimum that there is a fair chance of success on the merits."

Johnson v. California State Bd. of Accountancy, 72 F.3d 1427, 1430 (9th Cir. 1995) (quoting Martin, 740 F.2d at 675).

In cases brought by prisoners involving conditions of confinement, any preliminary injunction "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to

correct the harm." 18 U.S.C. § 3626(a)(2).

Discussion

In this case, on this showing, it appears that the balance of hardships tip decidedly in plaintiff's favor. Defendant Woodford does not dispute that plaintiff is suffering great pain for his three injuries nor does she contend that, other than a single epidural injection for his shoulder injury, that he has really received treatment for his shoulder pain. In fact, the reference to the still-to-be-administered second epidural injection for his low back pain to be done in mid-September indicates that it has not yet occurred and September's end approaches rapidly. In addition, defendant's counsel references an MRI in September, 2004 that "revealed" a rotator cuff tear in plaintiff's right shoulder, but even in the limited medical records to which this court has had any access, an MRI two years earlier (September, 2002) had clearly identified a rotator cuff tear in plaintiff's right shoulder. See plaintiff's Exhibits.

Although the court cannot fully evaluate the likelihood of plaintiff's prevailing on the merits of this action at least as to his claims of inadequate medical care for a serious medical condition in violation of his rights under the Eighth Amendment, if not on his First Amendment claims of retaliation, plaintiff's showing demonstrates that his claims are colorable and are enough, in this instance, to warrant a TRO issued upon defendant Woodford, prohibiting plaintiff's transfer by MCSP to SVSP or any other prison facility without, at the least, declarations submitted which assure that SVSP has the capacity to address plaintiff's evidently long-neglected medical needs and that the orthopedic medical care provider apparently located there is both qualified to treat plaintiff's conditions and will do so forthwith. Plaintiff's allegation that he has been subjected to a pattern of being shuffled from one institution to the next in order for the state to avoid costly medical procedures does not appear to be without any foundation and has yet to be refuted by defendants at this very preliminary stage. While the court cannot make any finding at this point as to whether CDC officials have acted in good or bad faith in providing, or seeking to provide, medical care for plaintiff, even assuming the good faith of

prison officials, there comes a point when, to paraphrase a court-related aphorism, medical care delayed is medical care denied.

Accordingly, IT IS RECOMMENDED that a temporary restraining order issue prohibiting plaintiff's transfer from Mule Creek State Prison to Salinas Valley State Prison, or any other state prison facility, pending adjudication of a motion for preliminary injunction.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Defendant Woodford must file any objections by no later than September 23, 2005.

IT IS ORDERED that:

1. The court will consider plaintiff's motion for a preliminary injunction by no later than October 24, 2005;

2. Plaintiff must file a motion for a preliminary injunction, seeking to enjoin his transfer, and/or to receive specific medical care forthwith, as well as any further supporting documentation, in the form of medical records and/or affidavits, etc., by October 7, 2005; and

3. Defendants' response is due by no later than October 14, 2005.

DATED: 9/20/05

/s/ Gregory G. Hollows

GREGORY G. HOLLOWS
UNITED STATES MAGISTRATE JUDGE

GGH:009
cons1701.ofr