1

2

3

4

5

6

7

8                         IN THE UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10   SAM CONSIGLIO,

11           Plaintiff,                        No. CIV S-05-1701 GEB GGH P

12       vs.

13   JEANNE WOODFORD, Director of
     the California Department of Corrections,      ORDER &

14
                 Defendants.                   FINDINGS AND RECOMMENDATIONS

15   _____/

16   Background

17           Plaintiff, a state prisoner proceeding pro se and in forma pauperis, seeks relief

18   pursuant to 42 U.S.C. § 1983.  Presently pending before the court is plaintiff's motion for a

19   preliminary injunction (entitled a "motion for permanent or temporary injunction....") to enjoin

20   defendants from transferring him from Mule Creek State Prison (MCSP) to Salinas Valley State

21   Prison (SVSP), or any other prison facility, until he receives currently scheduled medical care.

22   By order filed on October 20, 2005, the court has directed service of plaintiff's amended

23   complaint upon Jeanne Woodford and seven additional defendants.  Service upon defendant

24   Woodford was ordered on September 2, 2005, and defendant Woodford was granted ten days to

25   respond to plaintiff's request for a TRO to prevent his transfer because plaintiff threatened

26   suicide should an anticipated immediate transfer from MCSP occur before he received adequate

1

1  medical treatment for painful injuries from which he claimed to have been suffering for many

2  years.

3          On September 20, 2005, the undersigned recommended issuance of a TRO

4  prohibiting plaintiff's transfer from MCSP pending adjudication of a motion for preliminary

5  injunction.  Judge Burrell denied the TRO, finding that there was no evidence in the record

6  indicating that plaintiff was subject to "a significant threat of being transferred during the time

7  that the TRO plaintiff requests would be in effect."  Order, filed on September 30, 2005, p. 2.[1]

8  The district judge also found that "plaintiff's concern about a possible transfer has not been

9  shown to constitute a significant threat of irreparable harm."  Id., p. 3.  Judge Burrell affirmed the

10 order upon plaintiff's request for reconsideration by order filed on October 13, 2005.  The district

11 judge, however, did not reference plaintiff's motion for preliminary injunction for which this

12 court had set the schedule in the order filed on September 20, 2005.

13 Amended Complaint

14         Included here are the allegations of the amended complaint as set forth previously

15 by the court:

16         [P]laintiff alleges that in January 2000, he suffered a serious knee
       injury in the prison laundry that has never been treated properly.
17     First Amended Complaint (FAC), p. 3.  Due to the defendants'
       deliberate indifference to, and long delay in, treating this serious
18     injury, plaintiff now needs an artificial joint replacement in that
       knee.  Id.
19
       In November of 2001, plaintiff suffered a serious back injury in the
20     prison laundry while at work, which has never been properly
       treated primarily because defendant Hernandez, Warden at R. J.
21     Donovan Correctional Facility, had plaintiff transferred "illegally"
       in 2004 despite a medical hold placed on plaintiff.  FAC, p. 4.  The
22

23         [1] In a supplemental filing on October 7, 2005, defendant Woodford's counsel indicated
   that after defendant's response was filed on September 16, 2005, the classification staff
24 representative (CSR) did, in fact, endorse the transfer but a hold was placed on the transfer upon
   the filing of the Order and Findings and Recommendations on September 20, 2005.  Based on the
25 scheduling order of the motion for preliminary injunction, it appears that at least an unofficial
   hold has been placed on the transfer pending adjudication of the motion for preliminary
26 injunction, but that is not entirely clear.  See defendant's supplement filed on October 7, 2005.

transfer was in retaliation for plaintiff's having exposed the physical and sexual abuse of mentally ill inmates. Id. Defendant Hernandez placed plaintiff in administrative segregation for over three months on false charges that were never adjudicated and had plaintiff transferred without a hearing in violation of due process. Id.

On April 15, 2002, plaintiff sustained a third injury in the prison laundry, tearing the rotator cuff in his right shoulder, an injury which has never been treated. Defendant Dr. Bradley Williams, a doctor at Doctor's Hospital at Manteca, under contract with Mule Creek State Prison (MCSP), delayed, and ultimately denied, treatment, ordering in the interim costly and unnecessary tests. Id.

Following plaintiff's "illegal" transfer, on January 26, 2004, to Folsom State Prison, he was transferred by the end of March, 2004 to CMC-E, a "supposed" medical treatment facility, when authorities at Folsom realized how much medical treatment plaintiff needed. Id. Defendant Marshall, Warden of CMC-E, had plaintiff transferred "illegally" to MCSP on August 11, 2004, by "falsifying" a CDC 1845 form. Id.

In the year plaintiff has been transferred to MCSP, plaintiff has received constant threats of a retaliatory transfer for continuing to complain about not receiving adequate medical care. Id. As of August 2005, five surgical procedures have been approved and scheduled for plaintiff. Id. On August 2, 2005, when plaintiff appeared before the Unit Classification Committee (UCC), he was told he would remain at MCSP for another year; shortly thereafter, defendants Arnold, Reyes, Smith and Brett Williams "decided to get rid of plaintiff" despite his pending surgical procedures. Id. Defendant Campbell, Warden of MCSP, has failed to protect plaintiff from this retaliatory action. Id. The anticipated transfer is also an effort by MCSP to avoid spending the $100,000 cost for all of plaintiff's surgeries. Id. Defendant Woodford has approved all of plaintiff's transfers. FAC, p. 5. Plaintiff seeks both injunctive relief and monetary damages.

See Order and Findings and Recommendations, filed on September 20, 2005, pp. 2-3.

Preliminary Injunction Standard

The legal principles applicable to a request for preliminary injunctive relief are well established. "The traditional equitable criteria for granting preliminary injunctive relief are: 1) a strong likelihood of success on the merits, 2) the possibility of irreparable injury to plaintiff if the preliminary relief is not granted, 3) a balance of hardships favoring the plaintiff, and 4) advancement of the public interest (in certain cases)." Dollar Rent A Car v. Travelers Indem.

1  Co., 774 F.2d 1371, 1374 (9th Cir. 1985).  The criteria are traditionally treated as alternative

2  tests.  "Alternatively, a court may issue a preliminary injunction if the moving party demonstrates

3  'either a combination of probable success on the merits and the possibility of irreparable injury or

4  that serious questions are raised and the balance of hardships tips sharply in his favor.'"  Martin

5  v. International Olympic Comm., 740 F.2d 670, 675 (9th Cir. 1984) (quoting William Inglis &

6  Sons Baking Co. v. ITT Continental Baking Co., 526 F.2d 86, 88 (9th Cir. 1975)).  The Ninth

7  Circuit has reiterated that under either formulation of the principles, if the probability of success

8  on the merits is low, preliminary injunctive relief should be denied:

9          Martin explicitly teaches that "[u]nder this last part of the
           alternative test, even if the balance of hardships tips decidedly in
10         favor of the moving party, it must be shown as an irreducible
           minimum that there is a fair chance of success on the merits."

11

12  Johnson v. California State Bd. of Accountancy, 72 F.3d 1427, 1430 (9th Cir. 1995) (quoting

13  Martin, 740 F.2d at 675).

14          In cases brought by prisoners involving conditions of confinement, any

15  preliminary injunction "must be narrowly drawn, extend no further than necessary to correct the

16  harm the court finds requires preliminary relief, and be the least intrusive means necessary to

17  correct the harm."  18 U.S.C. § 3626(a)(2).

18  Plaintiff's Motion

19          Plaintiff seeks a preliminary injunction against defendants preventing his transfer

20  to another prison until his current medical complaints are addressed and until Dr. White, MCSP

21  Chief Psychologist (not a defendant), or his subordinates clear plaintiff for the transfer

22  psychologically or until full adjudication of this case.  Plaintiff states that his mental state is

23  "very fragile" because of the constant threat of transfer over the past year and that a further

24  transfer would constitute the fourth transfer in eighteen months.  Plaintiff claims that all transfers

25  since January 26, 2004 have been retaliatory.  He further claims that defendant's counsel in her

26  \\\\\

1  September 16, 2005 response to plaintiff's TRO request claimed falsely that Dr. White endorsed

2  a transfer.  Motion, pp. 1-2.

3          Plaintiff was apparently not able to secure an affidavit from Dr. White, and now

4  seeks an evidentiary hearing to demonstrate whether he approves plaintiff's transfer or not.  See

5  plaintiff's filings on October 20, 2005 and October 21, 2005.  Plaintiff has included as exhibits

6  after the filing of his motion, chronological interdisciplinary progress notes (hereafter

7  abbreviated as "progress notes") of Dr. W. J. White with entries on September 2, 2005 and

8  October 4, 2005.  On September 2, 2005, Dr. White recommended plaintiff's "short-term re-

9  admission as medical necessity to CCCMS (California Correctional Case Management) to

10  provide him brief supportive counseling and monitoring while the transfer issues are being

11  resolved."  In a later entry, after plaintiff has been admitted, at least as an outpatient to CCCMS,

12  Dr. White states that he has not served as a direct provider of mental health services for plaintiff,

13  but sets forth, inter alia, the following:

14          "Mr. Consiglio is...known to me in my capacity as Chief
         Psychologist.  This includes a review of his Unit Health Record,
15         inquiries of his former Case Manager, multiple face-to-face
         contacts and correspondence received from him... Currently
16         inmate-patient Consiglio is being considered for a transfer to
         another institution.  He has multiple medical problems in various
17         stages of workup and treatment that he fears will be delayed or
         disrupted.  Likewise, he fears for his safety should he transferred.
18         He perceives any transfer as distinctly adverse and inimical to his
         interests and construes it as deliberate and punitive...

19
         Should Mr. Consiglio's transfer proceed at this time, it is my
20         opinion it will likely precipitate a major psychological crisis, a
         crisis that will or can result in significant destabilization and
21         increased risk of self-harm or suicide.  Any such crisis will require
         specific mental health interventions such as MHCB admission,
22         suicide watch or precautions, change of level-of-care and/or
         psycho-pharmacological management.

23

24  Plaintiff's exhibit, filed on October 20, 2005, from progress notes of Dr. White on 10/04/05.

25          On October 5, 2005, (non-defendant) Senior Psychologist Supervisor K. Powell,

26  also relied on by defendant (see below), stated that he is not plaintiff's case manager, but

1   observed that plaintiff "has a well thought out and detailed suicide plan which in reality, he could

2   carry out."  Plaintiff's exhibit, filed on October 20, 2005, from progress notes of Senior

3   Psychologist Supervisor K. Powell on 10/5/05.  Dr. Powell notes that plaintiff "is generally stable

4   until he talks about his pending transfer and medical problems."  <u>Id</u>.  Even being taken away

5   from MCSP overnight to a hospital apparently causes plaintiff concern for his safety.  <u>Id.</u>  Dr.

6   Powell concludes:

> It is my opinion that this inmate will not be able to tolerate the
> anxiety and fear a transfer can bring about.  He continues to be a
> high risk to attempt suicide if his situation is destabilized.  This
> inmate has thought about his situation and how he will respond for
> a long time.  His statements should be taken seriously.

10  <u>Id.</u>

11          Plaintiff claims that after waiting for almost two years since cortizone epidural

12  injections were ordered for his "severe back pain," he has had two of the three injections: one on

13  July 14, 2005 and one on September 15, 2005.  If a third is necessary, it should be given in about

14  three or four months.  Plaintiff believes that to transfer him in the middle of "neurological

15  treatments" is tantamount to trying to transferring an inmate while he is on the operating table.

16  Plaintiff claims that the two injections have reduced his back pain by 60% and expresses

17  confidence that after the final injection, he will not need the second surgery recommended by

18  non-defendant Dr. Barba nearly three years ago.  Motion, pp. 2-3.

19          Plaintiff also claims that he was seen by Dr. Tran, a gastro-intestinal specialist at

20  Doctor's Hospital in Manteca (not a defendant), on September 20, 3005, who ordered a

21  colonoscopy that should be completed in two to three months.  Plaintiff had polyps removed in

22  1974 and 2003 and Dr. Tran has told him that after the colonoscopy, he can determine whether or

23  not he will perform hemorrhoid surgery.  Due to retaliatory transfers, plaintiff was unable to

24  receive the colonoscopy in 2004, when it was supposed to have been done.  He believes that both

25  the potential third injection of cortizone and for his back and his pending colonoscopy militates

26  against transferring him or these procedures may not be completed as planned.  Motion, p. 3.

1        Plaintiff states that he has waited for more than three and a half years for shoulder

2    surgery to repair a torn rotator cuff and over five and a half years for knee surgery.  Had he not

3    been subject to an "illegal retaliatory transfer" on January 26, 2004, both surgeries would have

4    been completed as early as 2004 by an orthopedic specialist named Dr. D. Smith (not a

5    defendant).  Plaintiff alleges that defendant Warden Hernandez fabricated a safety concern to

6    transfer him from R.J. Donovan so that he could be transferred despite a medical hold.  Plaintiff

7    encloses an April 8, 2004 CDC 128 chrono as an exhibit wherein non-defendant CMC Chief

8    Physician Ellen Greenman, recommends transfer back to RJD so that the same neurosurgeon

9    who performed the first surgery could complete his treatment.  Even though Dr. Greemman's

10   recommendation was not followed, plaintiff has been well-treated by a Dr. Min Zheng for his

11   back injury, but still complains that he was forced to endure three years of unnecessary intense

12   pain.  Motion, pp. 4-5.  Although plaintiff's next orthopedic appointment is sent for March 2006

13   at UC Davis Outpatient Orthopedic Clinic, he is satisfied that relief is in sight.  Motion, p. 5.

14       Plaintiff argues that there is no reason to transfer a Level II inmate, which he is, to

15   a Level III prison and that the authorization of the involuntary transfer is purely retaliatory

16   because he has attempted to obtain adequate medical care and because he has written letters to

17   defendant Campbell complaining of staff misconduct.  Plaintiff also asserts that there are several

18   false statements in defendant's counsel's declaration, filed in response to the TRO, for which he

19   does not generally fault her because he believes she has been misled.  Motion, p. 5.

20       He already asserted that Dr. White did not support his transfer, as was represented

21   by counsel.  He claims not to have refused a medical appointment on December 21, 2004 or any

22   other medical treatment and challenges non-defendant T. Weinhold to produce any record of

23   such a refusal.  Motion, pp. 5-6.  He argues that a second M.R.I. of his right shoulder was

24   unnecessary after one had been done in 2002.  He contends that his counselor Ms. Sells (not a

25   defendant) did not put him up for transfer but that defendant K. Reyes, who is not his counselor

26   and knows nothing of his medical needs, did.  Motion, pp. 6-7.  In opposition, in defendant's

1    Exhibit B, CC-1 K. Reyes' declaration, p. 2, defendant Reyes states that she is the backup

2    counselor when plaintiff's assigned counselor is absent and has met with and interviewed

3    plaintiff several times.

4          Plaintiff contends that the prison staff's assertion that his transfer was solely

5    intended to address his medical needs is patently false since five surgical procedures have been

6    approved and scheduled by MCSP medical staff.  He claims that he never told a clinical social

7    worker, Ms. Nechay[2] (not a defendant), as was wrongly asserted in the CDC 128G chrono before

8    the Unit Classification Committee which defendant's counsel included with her declaration in

9    response to plaintiff's TRO request (and here in the opposition as Attachment 1 to defendant's

10   Exhibit B), that he wished to remain at MCSP so his mother could visit him as she has been

11   deceased since 1991, a fact documented in his prison file and an assertion Ms. Nechay denies

12   ever having made to the UCC.  Motion, p. 7.  Despite his many complaints about inadequate

13   medical treatment, MCSP is the prison at which he has felt the safest in fourteen years.  Motion,

14   pp. 7-8.

15         Nevertheless, plaintiff claims, since August 2005, he has also been harassed by

16   unnamed individuals of the MCSP mailroom staff with respect to his legal mail, in part in the

17   form of not receiving the Daily Appellate Reports he is supposed to receive every day.  He also

18   claims that his outgoing legal mail is constantly returned and he is told that he is limited to five

19   pieces of legal mail per week.  He states that the mail staff has refused to supply him with paper

20   and envelopes for his legal work and contends the "recent harassment" is a retaliatory result of

21   his pending litigation.  Motion, p. 8.

22         Plaintiff includes a declaration which reiterates or clarifies many of the allegations

23   of his underlying amended complaint, including claims that he was transferred from both Folsom

24   and California Men's Colony, following his retaliatory transfer from RJ Donovan, because he

25   ───────────────

26         [2] Plaintiff spells the name as "Nachay," but defendant's filings indicate that the name is
     spelled "Nechay."  See defendant's Exhibit E, Declaration of Dr. K. Powell, p. 2.

8

1   had too many unresolved medical issues.  Plaintiff's Declaration, pp. 1-2.  He claims that he was

2   assured that his medical needs would be immediately addressed at MCSP when he was

3   transferred there on August 11, 2004.  Id., pp. 2-3.  On August 2, 2005, he was told by his

4   counselor, Ms. Sells, that the UCC had agreed to retain him at MCSP for another year, but that

5   on August 29, 2005, defendant Reyes, who has nothing to do with his case, told him that the

6   promise was being rescinded and he was being put up for transfer to SVSP.  Id., p. 3.  Dr. White,

7   widely recognized "as one of the most honest staffmembers at MCSP," told plaintiff on

8   September 1, 2005, that he had sent a memo to defendant Brett Williams, MCSP Chief Medical

9   Officer, recommending that a medical hold be placed on plaintiff due to his many unresolved

10   medical issues.  Id., p. 4.  On September 20, 2005, Dr. White reassured plaintiff that he had never

11   recommended a transfer and had even called defense counsel to make sure she was not confused

12   on this point.  Id., p. 5.  Ms. Nechay told plaintiff she not only never told the UCC that he had

13   claimed to need to stay at MCSP so his mother could visit him, but asserted that he had never

14   discussed his mother with her at any therapy session.  Id

15   Opposition

16          Defendant Woodford avers that plaintiff is classified as an "R" suffix inmate,

17   requiring sensitive needs yard (SNY) placement.   SNY placement allows inmates who may have

18   enemy concerns to be housed safely and to participate in normal programming without fear of

19   inmate assault.  Plaintiff has been housed in a sensitive needs yard facility at MCSP since his

20   transfer on August 11, 2004.  Plaintiff is a level II inmate who nevertheless has close custody

21   status requiring that he be housed in a cell.  Opposition (Opp.), p. 3, Exhibit A, Declaration of S.

22   Winkler, MCSP Correctional Counselor I, pp. 1-3.  CC-I Winkler is a nineteen-year employee of

23   the California Department of Corrections and Rehabilitation (CDCR), formerly the California

24   Dept. of Corrections, and has held his current position for about five years; he is responsible for

25   classifying inmates assigned to him on Facility B at MCSP.  Winkler Dec., p. 1.  According to

26   CC-1 Winkler, CDCR is seriously considering a proposal to switch the SNY population with the

9

general population at Folsom State Prison, converting MCSP wholly to a general population facility. Id., p. 3. CC-1 Winkler states that his review of plaintiff's central file indicates that, on September 7, 2005, plaintiff's Facility B UCC review resulted in the UCC rescinding the August 2, 2005 classification staff representative's (CSR's) August 2, 2005 referral to retain plaintiff at MCSP III SNY due to the conversion of MCSP to a general population facility. Id. In any event, CC-I Winkler adds that it was noted that SVSP had a specialist under contract who could treat plaintiff's medical needs while MCSP does not and that the UCC recommended plaintiff's transfer to SVSP Level III SNY; a 9/19/05 chrono indicates that the CSR endorsed the transfer with a "time override" (a term which is unexplained). Id. A hold was placed on the transfer on September 20, 2005, as a result of [this] litigation. Id., and attachment. CC-I Winkler maintains that if plaintiff is not transferred to SVSP, he would have to be transferred to a SNY at another facility if the contemplated conversion goes through as plaintiff cannot be transferred to Folsom State Prison because it does not have the level terrain required by plaintiff according to his most recent CDC 1845 dated 4-05-05. Id., p. 4. The court notes that in a filing dated October 20, 2005, plaintiff endorses CC-I Winkler as "one of the best and most honest counselors here" and his "statement" as "pretty accurate."

According to defendant, plaintiff has received a significant degree of medical treatment while in prison. Opp., p. 3, citing defendant Smith's Decl., p. 2. Defendant Dr. C. Smith is the Chief Physician and Surgeon at MCSP. Exhibit C, Smith Decl., p. 1. Defendant Smith states that he has reviewed plaintiff's voluminous medical records.

Left Knee

Defendant Smith reviews the history of plaintiff's knee injury, beginning with his having provided a medical history on May 19, 1993, including a report of an on-the-job truck accident injury, wherein plaintiff sustained injuries to his left knee and back. Smith Decl., p. 2. Defendant Smith goes on to state that plaintiff "subsequently" had surgery to his left knee "in the early 1980's." Id.

1    As far as his treatment in prison, plaintiff was seen in the outpatient clinic for his

2 left knee condition on 6/18/92, 5/19/93, 7/25/94, and 9/8/94; recommendations were made for

3 Motrin and proper exercise and weight loss.  Id.  In March, 1995, plaintiff, who was then 43, told

4 an orthopedist, Dr. Lai (a non-defendant), that he had had arthroscopic surgery on his left knee in

5 1983 and had thereafter had difficulties with the knee; plaintiff wished to continue with

6 Ibuprofen and asked for a total knee replacement.  Smith Decl., pp. 2-3.  Dr. Lai found that

7 plaintiff was too young and obese for a total knee replacement.  Id., p. 3.  Plaintiff was seen on

8 April 19, 1995 in the orthopedic clinic by Dr. Lai, as well as in the outpatient clinic for his left

9 knee on August 9, 1996, September 13, 1996, and October 21, 1996.  Id.  On July 9, 1997, Dr.

10 Lai saw plaintiff for his left knee; his weight had increased; x-rays confirmed advanced

11 osteoarthritis in his left knee and Motrin and a knee brace were recommended.  Id.  Medication

12 renewal outpatient visits occurred on April 19, 1999 and July 26, 1999, according to plaintiff's

13 medical records.  Id.

14    Dr. David Smith (not a defendant) saw plaintiff on September 15, 1999 for

15 chronic left knee pain and lower back pain.  C. Smith Dec., p. 4.  X-rays again showed

16 degenerative joint disease; plaintiff was prescribed a muscle relaxer and Motrin and given a two-

17 day lay in.  Id.  On September 28, 1999, plaintiff had an outpatient visit.  Id.

18    On January 5, 2000, plaintiff reported that he had tripped on a floor mat and

19 twisted his left knee.  Id.  It is this injury to his knee that is one of the three injuries for which he

20 alleges inadequate medical treatment in his complaint.  Defendant asserts that plaintiff had a pre-

21 existing arthritic knee as shown by x-rays on March 14, 1995 and the history recounted above.

22 Id.  Defendant C. Smith records that Dr. D. Smith saw plaintiff in the orthopedic clinic for his

23 left knee on January 12, 2000, January 26, 2000, and on March 1, 2000.  At the first visit,

24 plaintiff was placed on a Prednisone taper, giving one Tylenol with Codeine, and was allowed an

25 extra mattress.  Id.  On the follow-up, plaintiff's symptoms appeared to be returning with the

26 tapering of the Prednisone dosage; plaintiff was prescribed an anti-inflammatory.  Id.  At his

third visit following his left knee injury, Dr. D. Smith was found to have joint swelling and x-rays were ordered.  Id.  On March 16, 2000, plaintiff was approved for left knee arthroscopy, which he had on April 4, 2000.  Id.  Dr. D. Smith saw plaintiff on May 17, 2000, when he was reportedly doing well and apparently virtually pain free with an increased range of motion and decreased swelling.  Id., p. 5.  Plaintiff was given Indocin and Robaxin, a muscle relaxant, and a chrono for an extra mattress for a year.  Id.

Dr. D. Smith saw plaintiff again on March 21, 2001, July 18, 2001, October 17, 2001, September 4, 2002 for his knee.  Id.  Plaintiff was given a cortisone injection into his left knee on the first of this series of visits for his pain and referred for consideration for soft shoes.  Id.  On the second, he was prescribed a Prednisone taper; plaintiff was seen for pain on the third visit, with no treatment reported.  Id.  On the last visit, plaintiff was prescribed Indocin for pain and as an anti-inflammatory; Dr. D. Smith believed a total knee replacement would be needed eventually.  Id.   No further treatment for, or evaluation specifically of, plaintiff's left knee is set forth, until October 13, 2004, after plaintiff had arrived at MCSP and consulted with an orthopedist, defendant Dr. Williams, at which time plaintiff apparently told that defendant that his left knee was not nearly as bad as his right shoulder, for which he sought help; nevertheless, plaintiff was given a steroid injection to his left knee on that day.  Id.

Right Shoulder

As for his right shoulder, defendant Smith indicates that plaintiff first complained of discomfort there on October 23, 2000 (Smith Dec., p. 6), a date which, the court notes, predates the right shoulder injury which is alleged to have occurred in April of 2002, but is the first and only record defendant could find for any complaint by plaintiff about that area preceding the shoulder injury complained of by plaintiff herein.  On September 9, 2002 (a date several months after the alleged injury), plaintiff's MRI showed a complete rotator cuff tear and osteroarthritis of the AC joint.  C. Smith Dec., p. 6.  Dr. D. Smith recommended right shoulder arthroscopy; on December 3, 2002, plaintiff was admitted to Alvarado Hospital, where he

1   underwent arthroscopic surgery performed by Dr. D. Smith.  Id.  Plaintiff, in his October 20,

2   2005, disputes defendant C. Smith's assertion in his review of plaintiff's medical record, stating

3   that he never had any surgery to his right shoulder, a dispute which the court cannot resolve on

4   this showing, without the record evidence.  On January 27, 2003, Dr. D. Smith saw plaintiff for a

5   follow-up, according to defendant Smith, at which time, plaintiff exhibited an increased range of

6   motion, but complained of residual pain at night.   Smith Dec., p. 6.

7           Although another follow-up was scheduled for a month later, defendant Smith

8   does not reference any further medical attention in plaintiff's medical records to plaintiff's right

9   shoulder until September 22, 2004 (well over a year and a half later), when plaintiff, then housed

10  at MCSP, saw defendant Williams for an orthopedic consultation for his right shoulder

11  discomfort.  Smith Dec., p. 6.  Although not stated here, in defendant's response to plaintiff's

12  TRO, counsel set forth that defendant Dr. Bradley Williams ordered an MRI of plaintiff's right

13  shoulder.  Plaintiff returned to see him on October 13, 2004 for his shoulder injury and to have

14  his left knee examined.  As noted, although plaintiff sought treatment more for his right shoulder,

15  he was given a steroid injection for his left knee on October 13, 2004.  Id.  Defendant Bradley

16  Williams upon reviewing the MRI taken on November 4, 2005, before recommending surgery,

17  due to plaintiff's cardiac history, required plaintiff to see a cardiologist to be cleared for shoulder

18  surgery.  Id.  Plaintiff saw a cardiologist, Dr. Baluyat (not a defendant), at Doctor's Hospital in

19  Modesto/Manteca, who, on June 20, 2005, cleared him for surgery.  Smith Dec., p. 7.  Although

20  defendant Smith does not comment on it, this amounted to a delay of more than seven months

21  before plaintiff was seen by the cardiologist following defendant Bradley Williams' review of the

22  11/4/05 MRI.

23          Defendant Bradley Williams, thereafter, on June 29, 2005, recommended the

24  shoulder surgery but his contract had expired.  Smith Dec., p. 7.  A recommendation for

25  expedited surgery was made due to the recent cardiac clearance, but the orthopedist at Queen of

26  the Valley Hospital, Dr. Schifflet, to whom plaintiff was referred on August 15, 2005, refused to

13

1   do the surgery.    Smith Dec., p. 7.

2           UC Davis Medical Center was then sent plaintiff's medical records for review.  Id.

3   In the meantime, plaintiff's records were sent to Dr. Lee (not a defendant), a Health Care

4   Manager at SVSP, when defendant Smith was informed that SVSP had an orthopedist under

5   contract.  Id.  On September 12, 2005, UC Davis notified MCSP  that they would see plaintiff in

6   their clinic on  March 27, 2006 for an orthopedic consultation.  Id.  Because the consultation

7   would not be for another six months and in light of the cardiac clearance, defendant C. Smith

8   states that it was still necessary to consider whether the SVSP orthopedist could treat plaintiff on

9   a more expedited basis.  Id.  Defendant Smith states that he has communicated with Dr. Lee who

10  has informed him that SVSP can address plaintiff's right shoulder complaints on a more

11  expedited basis than can be done at UC Davis.  Smith Dec., p. 16.  Moreover, Dr. Lee has

12  informed him that SVSP has other specialty consultants who can treat plaintiff's other medical

13  conditions.  Id.   Plaintiff, for his part, is apparently willing to wait for the scheduled consultation

14  at the UC Davis Medical Clinic rather than be transferred.

15          Back

16          Defendant Smith states that the September 15, 1999 x-rays, which pre-exist

17  plaintiff's claimed back injury while working in the laundry room on November 12, 2001, show

18  that plaintiff has a prior lumbar fusion of the L4-L-5 spine.  Smith Dec., p. 8.  In any event,

19  defendant Smith makes no reference to any treatment for plaintiff's November, 2001 back injury

20  until February of 2002 when plaintiff underwent lower back surgery performed by non-defendant

21  Dr. Soumekh.  Id.  Plaintiff had several medical conditions on discharge involving L4 and L5.

22  Id.  Plaintiff was discharged from Alvarado Hospital after his February surgery on March 6,

23  2002; he was seen for a follow-up appointment by Dr. Soumekh on November 13, 2002, at which

24  time plaintiff claimed to be doing well until he fell.  Id.  An exam showed normal results but

25  plaintiff claimed mild discomfort in the lumbar spine and was asked to return in about a month.

26  Id.  Nothing is reported by defendant Smith from his review of the plaintiff's medical records to

1    indicate that plaintiff was returned at that time.

2            On May 6, 2003, plaintiff was seen by Dr. Barba (as noted, not a defendant), a

3    UCSD neurological consultant, who believed plaintiff had bilateral lower extremity numbness;

4    plaintiff did not describe back pain.  Id.   Dr. Barba recommended routine x-rays and an EMG to

5    look for pinching of the nerves; he would only consider surgery if there were a complication

6    from plaintiff's prior surgery, since plaintiff did not have back pain.  Id.  The July 18, 2003 EMG

7    of the left leg was normal, but the right leg showed changes consistent with a chronic lesion of

8    the L5 and S1 nerve roots.  Smith Dec., p. 9.  The lower extremity did not show peripheral

9    neuropathy.  Id.   In a September 2, 2003 follow-up visit, Dr. Barba saw plaintiff who

10   recommended a follow-up with his prior neurosurgeon to evaluate symptoms that suggested

11   recurrent lumbar spinal stenosis.  Id.   Defendant Smith does not indicate that this

12   recommendation was followed.

13           Almost a year later, on July 16, 2004, a lumbar MRI was done, which did not

14   identify evidence of central stenosis.  Id.  On October 25, 2004, non-defendant Dr. Farr, an

15   orthopedic consultant at Doctors Hospital of Manteca, evaluated plaintiff and suggested that

16   epidural injections might help to relieve plaintiff's symptoms.  Id.  On December 14, 2005,

17   plaintiff was referred to Dr. Zheng, not a defendant, about his chronic low back pain, a referral

18   that was made because Dr. Farr does not accept inmate patients.  Id.   Dr. Zheng also

19   recommended epidural injections.   Id.

20           According to defendant Smith, plaintiff received three caudal epidural injections

21   of the back, one on 4/5/2005, a second on 7/14/05, and a third on 9/15/05.  Smith Dec., pp. 9, 15.

22   Plaintiff, in an October 20, 2005 filing, takes issue with this, stating that he has had only two

23   epidural injections to date, the first one on July 14, 2005.  Although defendant does not note the

24   discrepancy, the court observes that in her declaration opposing plaintiff's TRO, defendant's

25   counsel states that she had been informed by plaintiff's medical return coordinator, T. Weinhold,

26   that Dr. Zheng recommended the epidural steroid injections and that plaintiff at that time had

1   received one on July 14, 2005 and was due for a second in mid-September, an assertion that

2   comports with plaintiff's representation, rather than that of defendant Smith.  See, 9/16/05

3   declaration of Jodie Scwab, p. 4.  In any event, at the time of his writing, according to defendant

4   Smith, plaintiff was due for a follow-up with Dr. Zheng for any continued low back pain and

5   chronic left knee discomfort on October 18, 2005.  Smith Dec., p. 10.

6                    Other Medical Conditions

7                    Defendant Smith also includes the medical history and treatment for other

8   conditions of the plaintiff, including coronary artery disease, hypertension, and hemorrhoids,

9   noting an acute heart attack plaintiff apparently suffered on July 5, 1988.  Smith Dec., pp. 2, 10-

10  14.  Relying on defendant Smith's review of plaintiff's medical records, defendant contends that

11  plaintiff's complaints of severe knee, shoulder, and back pain are belied by the history he has

12  provided to his treating physicians.  Opp., p. 4.

13                   Further Declarations

14                   Dr. Lee, Chief Medical Officer, as well as Health Care Manager at Salinas Valley

15  State Prison, declares that he oversees all medical and mental health care for inmates at SVSP, is

16  familiar with plaintiff's medical history and conditions, and is aware of the solutions to his

17  medical problems.  Opp., p. 4, Exhibit D, Lee Dec., pp. 1-2.  He states that SVSP has an

18  orthopedic doctor under contract, who can examine and treat plaintiff for his right shoulder, left

19  knee and lower back conditions.  Lee Dec., p. 2.  Specifically, he states, under penalty of perjury,

20  that he has agreed to place plaintiff in a priority position for an orthopedic consultation,

21  anticipating that plaintiff can be seen for a consultation for right shoulder within one (1) month

22  of his arrival at SVSP, should he be transferred.  Id.  He further represents that it is more likely

23  that plaintiff will be able to be seen by the SVSP orthopedist before he can be seen at his

24  currently scheduled consultation at UC Davis, but, as a precaution, that consultation will not be

25  cancelled.  Lee Dec., pp. 2-3.

26  \\\\\

1    In addition, Dr. Lee asserts that SVSP has a doctor of internal medicine who can

2    monitor and continue to treat plaintiff for his other medical conditions, including evaluating his

3    need for a colonoscopy.  Lee Dec., p. 3.  Dr. Lee also states that if plaintiff does have any outside

4    scheduled medical appointments at the time of his transfer, "upon timely notification," SVSP

5    will ensure that he keeps any such appointments by transporting him for the appointments.  Id.

6    Dr. Lee also is aware of plaintiff's suicide threats and provides assurances that

7    MCSP will provide notice to him prior to plaintiff's transfer and a discharge summary to himself

8    and the SVSP Chief Psychologist, Dr. Kahle, (a non-defendant) as to plaintiff's mental condition

9    and treatment, and that he will have plaintiff, immediately upon his arrival at SVSP evaluated

10   and monitored by the mental health department.  Lee Dec., p. 3.  If necessary, arrangements will

11   be made for a crisis management bed admission for plaintiff upon his transfer.  Id.

12   Defendant includes the declaration of Dr. K. Powell, the Senior Staff

13   Psychological Supervisor, who supervises all clinical case management programs involving the

14   mental care of inmates at MCSP, and whose progress notes were quoted in part above as part of

15   plaintiff's exhibits.  Opp., pp. 4-5, Exhibit E, Powell Dec., pp. 1-2.  Dr. Powell reviewed

16   plaintiff's mental health file, met with and evaluated plaintiff following his UCC hearing on

17   September 7, 2005, diagnosing him as having a generalized anxiety disorder.  Powell Dec., p. 2.

18   Plaintiff had been in the CCCMS program from 2003 to May 5, 2005, and Dr. Powell returned

19   him to the program on September 7, 2005 as a precaution, although he did not think him suicidal

20   at the time.  Id.  In CCCMS, to which treatment plan plaintiff agreed, plaintiff is monitored and

21   meets with a case manager every week or as needed.  Id.  Dr. Powell states that plaintiff is not

22   taking any medication for mental health purposes.  Id.  Upon his October 5, 2005 re-evaluation of

23   plaintiff, Dr. Powell did not find him at that time to be suicidal, but he states that any change in

24   his environment plaintiff perceives as a safety threat can destabilize him and that, while at MCSP

25   when he evaluated him, plaintiff was not suicidal, plaintiff is at risk to himself if he interprets a

26   new environment as hostile to him.  Powell Dec., p. 3.

1        Dr. R. Lipon, Acting Chief Psychiatrist at MCSP (not a defendant), also reviewed

2    plaintiff's mental health records, met with, evaluated, and diagnosed him. Opp., p. 5, Exhibit F,

3    Lipon Dec., pp. 1-2.   Dr. Lipon states that he could not rule out an Axis I diagnosis for

4    generalized anxiety disorder, noting a poly-substance abuse history with an institutional

5    remission.  Lipon Dec., p. 2.  On Axis II, Dr. Lipon assesses plaintiff as having a personality

6    disorder with histrionic borderline and antisocial traits.  Id.  Dr. Lipon opined that plaintiff is

7    very unpredictable and changes in his environment place him at risk for suicide, a risk he

8    characterizes as "mild-to-moderate."  Id.  However, the doctor does not believe the risk is limited

9    to a transfer to another institution and could include even changes such as a cell move or change

10   of a cellmate at MCSP.  Id.  Dr. Lipon believes that it is not unusual to transport and transfer a

11   plaintiff with suicidal ideation and that plaintiff could be transferred from MCSP to SVSP

12   through a doctor-to-doctor contact.  Id.  Dr. Lipon outlines the steps he would personally take or

13   make certain would be taken once plaintiff's transfer was approved, including placing plaintiff

14   immediately in the MCSP infirmary in a crisis bed, preparing an admission evaluation, treatment

15   plan and assembling of an interdisciplinary treatment team.  Lipon Dec., p. 3.

16       Plaintiff's mental health would be monitored and documented daily; contact

17   would be initiated with the Chief Medical and Mental Health Officers at SVSP and a discharge

18   summary transmitted to SVSP before plaintiff's arrival there.  Id.  In addition, a discharge

19   summary would also accompany plaintiff upon his transfer.  Id.  Plaintiff would be given special

20   transport to SVSP, whereupon plaintiff would be transported directly to the infirmary and

21   assessed by a mental health doctor to determine his mental health needs.  Id.  If plaintiff were

22   determined to be suicidal, SVSP could place him in the Department of Mental Health, located

23   next to SVSP.  Id.

24   \\\\\

25   \\\\\

26   \\\\\

1   Discussion

2                    Serious Questions/Irreparable Harm

3            Given the evaluation of defendant's own experts, there is little doubt that

4   plaintiff's threats of suicide, should he be transferred again without, at the least, receiving the

5   medical treatment for which he is currently scheduled, raise a serious question.  That his threats

6   may to some degree be characterized as manipulative and histrionic does not sufficiently mitigate

7   the risk or diminish plaintiff's apparent sense, well-grounded or not, of desperation.  Defendant

8   maintains that plaintiff has not adequately made a showing of irreparable harm because of either

9   his perception of past harms done him, that he has been transferred in the past so that CDCR can

10  avoid treating him, or on the basis that he is currently subject to deliberate indifference as to his

11  medical care.  Opp., p. 8.  However, the irreparable harm that plaintiff seeks to demonstrate is his

12  own suicide should he be transferred, and it goes without saying that carrying out that threat, for

13  which defendant's own experts state that he as at risk, would constitute irreparable harm.

14           As to evaluating the likelihood of plaintiff's success on the merits of his amended

15  complaint, the court must set forth the applicable legal standard.

16  Legal Standard for Eighth Amendment Claim

17           In order to state a § 1983 claim for violation of the Eighth Amendment based on

18  inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence

19  deliberate indifference to serious medical needs."  Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct.

20  285, 292 (1976).  To prevail, plaintiff must show both that his medical needs were objectively

21  serious, and that defendants possessed a sufficiently culpable state of mind.  Wilson v. Seiter,

22  501 U.S. 294, 299, 111 S. Ct. 2321, 2324 (1991); McKinney v. Anderson, 959 F.2d 853 (9th Cir.

23  1992) (on remand).  The requisite state of mind for a medical claim is "deliberate indifference."

24  Hudson v. McMillian, 503 U.S. 1, 4, 112 S. Ct. 995, 998 (1992).

25           A serious medical need exists if the failure to treat a prisoner's condition could

26  result in further significant injury or the unnecessary and wanton infliction of pain.  Indications

1    that a prisoner has a serious need for medical treatment are the following:  the existence of an

2    injury that a reasonable doctor or patient would find important and worthy of comment or

3    treatment; the presence of a medical condition that significantly affects an individual's daily

4    activities; or the existence of chronic and substantial pain.  See, e.g., Wood v. Housewright, 900

5    F. 2d 1332, 1337-41 (9th Cir. 1990) (citing cases); Hunt v. Dental Dept., 865 F.2d 198, 200-01

6    (9th Cir. 1989).  McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other

7    grounds, WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

8            In Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970 (1994) the Supreme Court

9    defined a very strict standard which a plaintiff must meet in order to establish "deliberate

10   indifference."  Of course, negligence is insufficient.  Farmer, 511 U.S. at 835, 114 S. Ct. at 1978.

11   However, even civil recklessness (failure to act in the face of an unjustifiably high risk of harm

12   which is so obvious that it should be known) is insufficient.  Id. at 836-37, 114 S. Ct. at 1979.

13   Neither is it sufficient that a reasonable person would have known of the risk or that a defendant

14   should have known of the risk.  Id. at 842, 114 S. Ct. at 1981.

15           It is nothing less than recklessness in the criminal sense—a subjective standard—

16   disregard of a risk of harm of which the actor is actually aware.  Id. at 838-842, 114 S. Ct. at

17   1979-1981.  "[T]he official must both be aware of facts from which the inference could be drawn

18   that a substantial risk of serious harm exists, and he must also draw the inference."  Id. at 837,

19   114 S. Ct. at 1979.  Thus, a defendant is liable if he knows that plaintiff faces "a substantial risk

20   of serious harm and disregards that risk by failing to take reasonable measures to abate it."  Id. at

21   847, 114 S. Ct. at 1984.  "[I]t is enough that the official acted or failed to act despite his

22   knowledge of a substantial risk of serious harm."  Id. at 842, 114 S. Ct. at 1981.  If the risk was

23   obvious, the trier of fact may infer that a defendant knew of the risk.  Id. at 840-42, 114 S. Ct. at

24   1981.  However, obviousness per se will not impart knowledge as a matter of law.

25           Also significant to the analysis is the well established principle that mere

26   differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth

1    Amendment violation.  Jackson v. McIntosh, 90 F.3d 330 (9th Cir. 1996); Franklin v. Oregon,

2    662 F.2d 1337, 1344 (9th Cir. 1981).

3                Moreover, a physician need not fail to treat an inmate altogether in order to violate

4    that inmate's Eighth Amendment rights.  Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir.

5    1989).  A failure to competently treat a serious medical condition, even if some treatment is

6    prescribed, may constitute deliberate indifference in a particular case.  Id.

7                Additionally, mere delay in medical treatment without more is insufficient to state

8    a claim of deliberate medical indifference.  Shapley v. Nevada Bd. of State Prison Com'rs, 766

9    F.2d 404, 408 (9th Cir. 1985).  Although the delay in medical treatment must be harmful, there is

10   no requirement that the delay cause "substantial" harm.  McGuckin, 974 F.2d at 1060, citing

11   Wood v. Housewright, 900 F.2d 1332, 1339-1340 (9th Cir. 1990) and Hudson, 112 S. Ct. at 998-

12   1000.  A finding that an inmate was seriously harmed by the defendant's action or inaction tends

13   to provide additional support for a claim of deliberate indifference; however, it does not end the

14   inquiry.  McGuckin, 974 F.2d 1050, 1060 (9th Cir. 1992).  In summary, "the more serious the

15   medical needs of the prisoner, and the more unwarranted the defendant's actions in light of those

16   needs, the more likely it is that a plaintiff has established deliberate indifference on the part of

17   the defendant."  McGuckin, 974 F.2d at 1061.

18               Superimposed on these Eighth Amendment standards is the fact that in cases

19   involving complex medical issues where plaintiff contests the type of treatment he received,

20   expert opinion will almost always be necessary to establish the necessary level of deliberate

21   indifference.  Hutchinson v. United States, 838 F.2d 390 (9th Cir. 1988).  Thus, although there

22   may be subsidiary issues of fact in dispute, plaintiff must, in the end, provide expert evidence

23   that the treatment he received equated with deliberate indifference thereby creating a material

24   issue of fact.  The dispositive question is ultimately not what was the most appropriate course of

25   treatment for plaintiff, but whether the failure to timely give a certain type of treatment was, in

26   essence, criminally reckless.

1        <u>Likelihood of Success on the Merits</u>

2        Although defendant maintains no deliberate indifference to plaintiff's medical

3   care has been shown in the treatment of his various injuries, beginning in 2000, to his left knee,

4   back, and right shoulder, and presents some evidence of the extensiveness of his medical record,[3]

5   there appear to be have been arguably significant gaps in his treatment, not only based on

6   plaintiff's allegations, as observed earlier, but also on defendant Smith's own review, also noted

7   above.

8        For example, from September 4, 2002 until October 13, 2004, there does not

9   appear to have been any medical attention to plaintiff's left knee injury, even though on 9/4/02,

10  the treating physician apparently concluded that plaintiff would eventually need a total knee

11  replacement.  After the October 13, 2004 steroid injection, no further mention of treatment of the

12  left knee at MCSP is set forth by defendant.  On the other hand, defendant maintains that plaintiff

13  at the time was more concerned about treatment of his right shoulder at MCSP.  As to the

14  treatment of the right shoulder, plaintiff maintains he never received any surgery, although

15  defendant's records apparently indicate otherwise.  And as to that injury, even in defendant

16  Smith's recounting, it appears that at least one follow-up was scheduled for which occurrence no

17  evidence is set forth, and there is a gap of time of over a year and a half, from January 27, 2003

18  to September, 2004, before plaintiff received any further treatment for that condition.

19  Moreover, on October 13, 2004, when defendant Smith avers that plaintiff indicated that the pain

20  in his right shoulder was much worse than the problem in his left knee, he was given a steroid

21  injection in the knee and the rotator cuff injury has yet to receive the surgical intervention,

22  apparently recommended by defendant Bradley Williams.

23  \\\\\

24  \\\\\

25  _____

26  [3] Defendant Smith states that plaintiff has three volumes of medical records.  Smith Dec., p. 2.

1    As for his back, plaintiff apparently never received the follow-up treatment by his

2 prior neurosurgeon recommended by Dr. Barba[4] and, although plaintiff has apparently

3 experienced relief from the epidural injections he has recently received, defendant Smith states

4 that he has received three of them, while plaintiff is adamant that he has received only two to

5 date and there is support in the record provided by defendant that substantiates plaintiff's claim

6 (the third one to be administered, if necessary, within the next three or four months).  It may be

7 that plaintiff is exaggerating the level of his pain and that he has received adequate medical care,

8 but that can by no means be resolved by defendant's present showing.  Nevertheless, it is

9 plaintiff's burden to show a likelihood of success on the merits of his underlying allegations and,

10 although it is by no means an easy question, the court does not find that he has demonstrated

11 such a likelihood at this stage.  Even so, plaintiff's threat to himself upon any transfer to SVSP

12 cannot be ignored and the court will require that if such a transfer is effected that defendant must

13 comply with representations herein of steps to be taken to protect plaintiff and to provide for his

14 expedited medical treatment.

15    As to his unrelated claims that his outgoing mail is being interfered and the

16 mailroom is not allowing him the paper and envelopes he needs for his legal work, the evidence

17 of his frequent filings in this case belies such a claim, as does the mail log submitted by

18 defendants.  Opp., p. 12, Exhibit G, declaration of MCSP mail room supervisor Holtorf and

19 attachment; Exhibit H, declaration of MCSP Senior Librarian L. Robinson.  Plaintiff's complaint

20 as to not receiving Daily Appellate Reports on a daily basis is not a supportable claim.

21    This court will recommend denial of plaintiff's motion for a preliminary

22 injunction to enjoin the defendants from transferring him from MCSP to SVSP prior to his

23 having received all of the medical treatment for which he is currently scheduled, but the court

24

25   [4] One of plaintiff's exhibits indicates that a CMC physician, Dr. Greenman, not
mentioned by defendant Smith, also recommended plaintiff's transfer from CMC so that plaintiff
26 could be followed up with by the same earlier surgeon.

1   will also require defendant Woodford and all of the defendants named in the first amended

2   complaint, as well as non-defendants Dr. Lipon and Dr. Lee, under the auspices of the CDCR

3   director defendant, to strictly comply with all of the steps they have set forth that they would take

4   should plaintiff be approved for transfer to SVSP.  No scheduled medical appointment will be

5   vacated.  Given the realities of a prison context, every reasonable precaution for plaintiff's safety

6   must be taken and each commitment to expedite plaintiff's medical care will be met.

7                    Accordingly, IT IS ORDERED that:

8                    1.  Plaintiff's multiple requests for an evidentiary hearing, made on October 12,

9   2005, October 20, 2005 and October 21, 2005, are denied as unnecessary;

10                   2.  If plaintiff is transferred from MCSP to SVSP, defendants must file a

11  declaration, within sixty days, ascertaining that each step set forth by Drs. Lipon and Lee for

12  plaintiff's safe transfer has been effected and that no currently scheduled medical

13  appointment/evaluation/procedure for plaintiff is vacated or cancelled, absent extraordinary

14  cause.  Plaintiff's mental condition must be monitored and defendants must include with the

15  affidavit a status report on his transfer, on his safe housing at SVSP, and on the progress of his

16  expedited medical treatment.  There will be no extension of time.  Failure to comply with this

17  order will result in the imposition of sanctions against defendants.

18                   IT IS RECOMMENDED that plaintiff's October 3, 2005 "motion for permanent

19  or temporary injunction....," construed as a motion for preliminary injunction, be denied.

20                   These findings and recommendations are submitted to the United States District

21  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

22  days after being served with these findings and recommendations, any party may file written

23  objections with the court and serve a copy on all parties.  Such a document should be captioned

24  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

25  shall be served and filed within ten days after service of the objections.  The parties are advised

26  \\\\\

                                        24

1  that failure to file objections within the specified time may waive the right to appeal the District

2  Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

3  DATED: 10/26/05

4                                                            /s/ Gregory G. Hollows

5                                                            _____
                                                             GREGORY G. HOLLOWS
                                                             UNITED STATES MAGISTRATE JUDGE

6

7  ggh:009
   cons1701.pi

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26