IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SAM CONSIGLIO,

            Plaintiff,                  No. CIV S-05-1701 GEB GGH P

    vs.

JEANNE WOODFORD, et al.,

            Defendants.          <u>ORDER</u> &

_____/     <u>FINDINGS AND RECOMMENDATIONS</u>

<u>Introduction</u>

           Plaintiff, a state prisoner proceeding pro se, seeks relief pursuant to 42 U.S.C. § 1983.  Pending before the court are: 1) defendant Bradley Williams' motion to compel discovery responses, filed on March 8, 2007, to which plaintiff filed an opposition on March 21, 2007;[1] 2) defendant Bradley Williams' motion for summary judgment, filed on June 13, 2007, to which plaintiff filed an opposition on July 5, 2007, after which defendant Williams filed a reply on July 6, 2007.

           Because defendant Williams, subsequent to filing the motion to compel, has filed a motion for summary judgment, the court finds that the discovery motion has been rendered

---

[1] Defendant's counsel, Dominique Pollara, filed, on March 26, 2007, a "Declaration in support of obtaining plaintiff's medical records."

1  moot and will vacate it.  Defendant Williams' answer was filed on June 12, 2007, after the

2  undersigned had filed Findings and Recommendations, on June 5, 2007, recommending denial of

3  defendant Bradley Williams' motion to dismiss, filed on September 13, 2006.  The Order

4  adopting the June 5th Findings and Recommendations and denying the motion to dismiss was

5  filed on August 13, 2007.

6  First Amended Complaint

7               Included here are the allegations of the first amended complaint, filed on

8  September 13, 2005, as set forth previously by the court:

9               [P]laintiff alleges that in January 2000, he suffered a serious knee
               injury in the prison laundry that has never been treated properly.
10              First Amended Complaint (FAC), p. 3.  Due to the defendants'
               deliberate indifference to, and long delay in, treating this serious
11              injury, plaintiff now needs an artificial joint replacement in that
               knee.  Id.

12
               In November of 2001, plaintiff suffered a serious back injury in the
13              prison laundry while at work, which has never been properly
               treated primarily because defendant Hernandez, Warden at R. J.
14              Donovan Correctional Facility, had plaintiff transferred "illegally"
               in 2004 despite a medical hold placed on plaintiff.  FAC, p. 4.  The
15              transfer was in retaliation for plaintiff's having exposed the
               physical and sexual abuse of mentally ill inmates.  Id.  Defendant
16              Hernandez placed plaintiff in administrative segregation for over
               three months on false charges that were never adjudicated and had
17              plaintiff transferred without a hearing in violation of due process.
               Id.

18
               *On April 15, 2002, plaintiff sustained a third injury in the prison*
19             *laundry, tearing the rotator cuff in his right shoulder, an injury*
               *which has never been treated.  Defendant Dr. Bradley Williams, a*
20             *doctor at Doctor's Hospital at Manteca, under contract with Mule*
               *Creek State Prison (MCSP), delayed, and ultimately denied,*
21             *treatment, ordering in the interim costly and unnecessary tests.*
               *Id.*[2]

22
               Following plaintiff's "illegal" transfer, on January 26, 2004, to
23             Folsom State Prison, he was transferred by the end of March, 2004
               to CMC-E, a "supposed" medical treatment facility, when
24             authorities at Folsom realized how much medical treatment

25  _____

26  [2] The italicized portion of the first amended complaint constitutes plaintiff's claim as to
defendant Bradley Williams.

1  plaintiff needed.  <u>Id</u>.  Defendant Marshall, Warden of CMC-E, had
   plaintiff transferred "illegally" to MCSP on August 11, 2004, by
2  "falsifying" a CDC 1845 form.  <u>Id</u>.

3  In the year plaintiff has been transferred to MCSP, plaintiff has
   received constant threats of a retaliatory transfer for continuing to
4  complain about not receiving adequate medical care.  <u>Id</u>.   As of
   August 2005, five surgical procedures have been approved and
5  scheduled for plaintiff.  <u>Id.</u>   On August 2, 2005, when plaintiff
   appeared before the Unit Classification Committee (UCC), he was
6  told he would remain at MCSP for another year; shortly thereafter,
   defendants Arnold, Reyes, Smith and Brett Williams "decided to
7  get rid of plaintiff" despite his pending surgical procedures.  <u>Id</u>.
   Defendant Campbell, Warden of MCSP, has failed to protect
8  plaintiff from this retaliatory action.  <u>Id</u>.   The anticipated transfer
   is also an effort by MCSP to avoid spending the $100,000 cost for
9  all of plaintiff's surgeries.  <u>Id</u>.  Defendant Woodford has approved
   all of plaintiff's transfers.  FAC, p. 5.  Plaintiff seeks both
10 injunctive relief and monetary damages.

11 <u>See</u> <u>Order</u> & <u>Findings and Recommendations</u>, filed on September 20, 2005, pp. 2-3; <u>see</u> <u>also</u>,

12 <u>Order</u> & <u>Findings and Recommendations</u>, filed on October 27, 2005, adopted by <u>Order</u>, filed on

13 December 21, 2005; and <u>see</u> <u>Order</u>, filed on August 28, 2006; <u>also</u>, <u>see</u>, <u>Order</u> & <u>Findings and</u>

14 <u>Recommendations</u>, filed on June 5, 2007, adopted by <u>Order</u>, filed on August 13, 2007.

15         On July 25, 2007, defendants Arnold, Reyes, Marshall, Hernandez, Campbell,

16 Smith, Brett Williams and Tilton having reached, with plaintiff, a stipulation as to his claims

17 against them, this matter was dismissed with prejudice as to all defendants but defendant Bradley

18 Williams, pursuant to Fed. R. Civ. P. 41(a).  Explicitly, as to the remaining defendant, plaintiff

19 states in his first amended complaint:

20         On April 15, 2002, Petitioner [sic] fell in the prison laundry and
          tore the rotator cuff in his right shoulder.  To this day, that injury
21        has never been treated.  Defendant Bradley Williams, M.D., an
          outside doctor a[t] Doctor's Hospital in Manteca, who was
22        contracted by MCSP to treat Plaintiff's knee and shoulder injury,
          delayed treatment by ordering unnecessary tests which bilked the
23        taxpayers, and when those unnecessary tests were done, Defendant
          Bradley Williams, M.D. refused to finish the job he was contracted
24        for.

25 First Amended Complaint, p. 4.

26 \\\\\

Motion for Summary Judgment

Defendant Dr. Bradley Williams moves for summary judgment under Fed. R. Civ. P. 56, on the ground that no evidence establishes that he demonstrated deliberate indifference to plaintiff's serious medical needs and that he is therefore entitled to judgment as a matter of law, there being no genuine issue of material fact.  Motion for Summary Judgment (MSJ), pp. 1-6.

*Legal Standard for Summary Judgment*

Summary judgment is appropriate when it is demonstrated that the standard set forth in Fed. R. Civ. P. 56(c) is met.  "The judgment sought shall be rendered forthwith if . . . there is no genuine issue as to any material fact, and . . .  the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

Under summary judgment practice, the moving party

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct., 2548, 2553 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  See id. at 322, 106 S. Ct. at 2552.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323, 106 S. Ct. at 2553.

\\\\\

1      If the moving party meets its initial responsibility, the burden then shifts to the

2  opposing party to establish that a genuine issue as to any material fact actually does exist.  See

3  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356

4  (1986).  In attempting to establish the existence of this factual dispute, the opposing party may

5  not rely upon the allegations or denials of its pleadings but is required to tender evidence of

6  specific facts in the form of affidavits, and/or admissible discovery material, in support of its

7  contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11,

8  106 S. Ct. at 1356 n. 11.  The opposing party must demonstrate that the fact in contention is

9  material, i.e., a fact that might affect the outcome of the suit under the governing law, see

10  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec.

11  Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the

12  dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

13  nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

14      In the endeavor to establish the existence of a factual dispute, the opposing party

15  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

16  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

17  versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

18  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

19  genuine need for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P.

20  56(e) advisory committee's note on 1963 amendments).

21      In resolving the summary judgment motion, the court examines the pleadings,

22  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

23  any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

24  477 U.S. at 255, 106 S. Ct. at 2513.  All reasonable inferences that may be drawn from the facts

25  placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S.

26  at 587, 106 S. Ct. at 1356.  Nevertheless, inferences are not drawn out of the air, and it is the

opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. 1356 (citation omitted).

On October 20, 2005, the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc),  cert. denied, 527 U.S. 1035 (1999), and Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988).

### *Legal Standard for Eighth Amendment Claim*

In order to state a § 1983 claim for violation of the Eighth Amendment based on inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 292 (1976).  To prevail, plaintiff must show both that his medical needs were objectively serious, and that defendants possessed a sufficiently culpable state of mind.  Wilson v. Seiter, 501 U.S. 294, 299, 111 S. Ct. 2321, 2324 (1991); McKinney v. Anderson, 959 F.2d 853 (9th Cir. 1992) (on remand).  The requisite state of mind for a medical claim is "deliberate indifference." Hudson v. McMillian, 503 U.S. 1, 4, 112 S. Ct. 995, 998 (1992).

A serious medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.  Indications that a prisoner has a serious need for medical treatment are the following:  the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.  See, e.g., Wood v. Housewright, 900

1   F. 2d 1332, 1337-41 (9th Cir. 1990) (citing cases); <u>Hunt v. Dental Dept.</u>, 865 F.2d 198, 200-01

2   (9th Cir. 1989).  <u>McGuckin v. Smith</u>, 974 F.2d 1050, 1059-60 (9th Cir. 1992), <u>overruled</u> <u>on</u> <u>other</u>

3   <u>grounds</u>, <u>WMX Technologies v. Miller</u>, 104 F.3d 1133 (9th Cir. 1997) (en banc).

4           In <u>Farmer v. Brennan</u>, 511 U.S. 825, 114 S. Ct. 1970 (1994) the Supreme Court

5   defined a very strict standard which a plaintiff must meet in order to establish "deliberate

6   indifference."  Of course, negligence is insufficient.  <u>Farmer</u>, 511 U.S. at 835, 114 S. Ct. at 1978.

7   However, even civil recklessness (failure to act in the face of an unjustifiably high risk of harm

8   which is so obvious that it should be known) is insufficient.  <u>Id.</u> at 836-37, 114 S. Ct. at 1979.

9   Neither is it sufficient that a reasonable person would have known of the risk or that a defendant

10   should have known of the risk.  <u>Id.</u> at 842, 114 S. Ct. at 1981.

11           It is nothing less than recklessness in the criminal sense – subjective standard –

12   disregard of a risk of harm of which the actor is <u>actually</u> aware.  <u>Id.</u> at 838-842, 114 S. Ct. at

13   1979-1981.  "[T]he official must both be aware of facts from which the inference could be drawn

14   that a substantial risk of serious harm exists, and he must also draw the inference."  <u>Id.</u> at 837,

15   114 S. Ct. at 1979.  Thus, a defendant is liable if he knows that plaintiff faces "a substantial risk

16   of serious harm and disregards that risk by failing to take reasonable measures to abate it."  <u>Id.</u> at

17   847, 114 S. Ct. at 1984.  "[I]t is enough that the official acted or failed to act despite his

18   knowledge of a substantial risk of serious harm."  <u>Id.</u> at 842, 114 S. Ct. at 1981.  If the risk was

19   obvious, the trier of fact may infer that a defendant knew of the risk.  <u>Id.</u> at 840-42, 114 S. Ct. at

20   1981.  However, obviousness <u>per se</u> will not impart knowledge as a matter of law.

21           Also significant to the analysis is the well established principle that mere

22   differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth

23   Amendment violation.  <u>Jackson v. McIntosh</u>, 90 F.3d 330 (9th Cir. 1996); <u>Franklin v. Oregon</u>,

24   662 F.2d 1337, 1344 (9th Cir. 1981).

25           Moreover, a physician need not fail to treat an inmate altogether in order to violate

26   that inmate's Eighth Amendment rights.  <u>Ortiz v. City of Imperial</u>, 884 F.2d 1312, 1314 (9th Cir.

1    1989).  A failure to competently treat a serious medical condition, even if some treatment is

2    prescribed, may constitute deliberate indifference in a particular case.  Id.

3         Additionally, mere delay in medical treatment without more is insufficient to state

4    a claim of deliberate medical indifference.  Shapley v. Nevada Bd. of State Prison Com'rs, 766

5    F.2d 404, 408 (9th Cir. 1985).  Although the delay in medical treatment must be harmful, there is

6    no requirement that the delay cause "substantial" harm.  McGuckin, 974 F.2d at 1060, citing

7    Wood v. Housewright, 900 F.2d 1332, 1339-1340 (9th Cir. 1990) and Hudson, 112 S. Ct. at 998-

8    1000.  A finding that an inmate was seriously harmed by the defendant's action or inaction tends

9    to provide additional support for a claim of deliberate indifference; however, it does not end the

10   inquiry.  McGuckin, 974 F.2d 1050, 1060 (9th Cir. 1992).  In summary, "the more serious the

11   medical needs of the prisoner, and the more unwarranted the defendant's actions in light of those

12   needs, the more likely it is that a plaintiff has established deliberate indifference on the part of

13   the defendant."  McGuckin, 974 F.2d at 1061.

14        Superimposed on these Eighth Amendment standards is the fact that in cases

15   involving complex medical issues where plaintiff contests the type of treatment he received,

16   expert opinion will almost always be necessary to establish the necessary level of deliberate

17   indifference.  Hutchinson v. United States, 838 F.2d 390 (9th Cir. 1988).  Thus, although there

18   may be subsidiary issues of fact in dispute, unless plaintiff can provide expert evidence that the

19   treatment he received equated with deliberate indifference thereby creating a material issue of

20   fact, summary judgment should be entered for defendants.  The dispositive question on this

21   summary judgment motion is ultimately not what was the most appropriate course of treatment

22   for plaintiff, but whether the failure to timely give a certain type of treatment was, in essence,

23   criminally reckless.

24        *Disputed & Undisputed Facts*

25        In support of his motion, defendant has included the declaration of Dr. Mark

26   Endicott.  See, Motion for Summary Judgment (MSJ), Declaration of Dr. Mark Endicott

8

(Endicott Dec.).  Dr. Endicott declares that he is a Board Certified Orthopedic Surgeon who is (or was at the time of signing his declaration) Chairman of Orthopedic Surgery at Sutter General Hospital, as well as a private practitioner.  Endicott Dec., ¶ 1.  He states that he is "familiar with the appropriate standard of care required within the medical community of a Board Certified Orthopedic Surgeon practicing under similar circumstances" as those encountered by defendant. Id., ¶ 2.  Dr. Endicott's evaluation of the quality of care defendant provided is based on his review of defendant's chart notes.  Id., ¶¶ 3-4.  Also included in support of the motion is a Declaration by Dominique Pollara (Pollara Dec.), defendant's counsel, to which is attached Exhibit (Ex.) A, portions of defendant's medical chart of defendant's treatment of plaintiff, and Ex. B, page 74 of plaintiff's deposition testimony, dated as taken on March 8, 2007, included to show that plaintiff states that he had a heart attack in 1998.  Ex. A to the Pollara Dec., includes a report, entitled "progress note," concerning treatment and assessment of plaintiff at Doctors Hospital of Manteca, dated 9/22/2004, indicating authorship by defendant; another progress report by defendant, dating plaintiff's admission as 10/13/2004 and discharge as 10/14/2004, about plaintiff's condition in an apparent follow-up visit; there is a third progress note, dated 6/29/05, by a Ronnie Escudero at Manteca, noting that plaintiff had last been seen on 10/14/05, indicating that at that time plaintiff was recommended for cardiology clearance prior to surgical intervention, and setting forth that plaintiff stated at the time of the 6/29/05 visit that he had obtained cardiology clearance about two weeks prior.[3]

   The following are drawn from defendant's[4] statement of undisputed material facts.

1. Defendant Williams first saw plaintiff for his right shoulder injury on September 22, 2004.

---

[3] Defendant does not explain the date discrepancy as to the previous last visit noted by R. Escudero (not a party).  Obviously, plaintiff could not have been properly noted as having been seen on 10/14/05, if the progress note was prepared months earlier, on 6/29/05.  The court logically infers that the year noted of the last visited was a typographical error, and that the date intended was 10/14/04.

[4] Since defendant Dr. Bradley Williams is the sole remaining defendant at this point in the litigation, the court will identify him henceforth simply as "defendant" or "defendant Williams."

MSJ, Endicott Dec., ¶ 4; Pollara Dec., Ex. A.  Plaintiff does not dispute this point, averring that on Sept. 22, 2004, but asserts that defendant informed plaintiff that MCSP had contracted him to treat plaintiff's knee as well.  Opposition (Opp.), p. 2; plaintiff's Declaration (plaintiff's Dec.), ¶ 3.  Plaintiff's expectation as to treatment of his knee pain by defendant appears to be supported somewhat by defendant's own reference in his 10/13/04 (or second) progress note that plaintiff's "chief complaint" was "of left knee pain and right shoulder pain."  Defendant refers to plaintiff's informing him that while he suffered a great deal of knee pain, it was not "nearly as bad as his right shoulder."  In addition, defendant references in that progress report plaintiff's having received a steroid injection in his "left will [sic] knee today."  <u>See</u>, MSJ, Pollara Dec., Ex. A.

Plaintiff does not dispute defendant's undisputed fact no. 2, which states that plaintiff informed defendant that he had continual right shoulder pain which had been bothering him for some time.  MSJ, Endicott Dec., ¶ 4; Pollara Dec., Ex. A.

As to fact no. 3, defendant states that there were no x-rays nor M.R.I.s available for defendant Williams' review.  Id.  While plaintiff avers that an M.R.I. was conducted in 2002 showing a torn [right] rotator cuff, he does not maintain that this M.R.I. was available for defendant's review when plaintiff was first seen by him.  (Opp., p. 3; plaintiff's Dec., ¶ 4).

The following facts are all supported in defendant's MSJ, by Endicott Dec., ¶ 4 and Pollara Dec., Ex. A, and are either undisputed or wholly unaddressed or insufficiently addressed by plaintiff: 4.  Defendant's physical examination showed good range of motion of the right shoulder with positive crepitation throughout all range of motion.  5. He had no significant tenderness at the AC joint.  6. His external rotation strength was good and he had symmetric range of motion.   7. He had pain with supraspinatus testing.  8.  Defendant gave plaintiff an injection of 40 mg/kg of Kenalog into the posterolateral portion of the shoulder.  10.  Defendant planned to follow up with plaintiff once the M.R.I. and x-rays of his right shoulder had been taken.

\\\\\

In fact no. 9, wherein defendant also relies on  Endicott Dec., ¶ 4 and Pollara Dec., Ex. A, defendant states that he suspected plaintiff most likely had a right rotator cuff tear and ordered an M.R.I. and x-rays to confirm this.  According to plaintiff, however, when defendant told plaintiff that he was ordering both a new M.R.I. and an expensive heart test, plaintiff strongly objected to both additional tests as unnecessary and as leading to delays of plaintiff's surgeries.  Plaintiff's Dec., ¶ 4.  While this does not expressly dispute defendant's point as stated, it is plaintiff's position that based on an M.R.I. which had already been done in 2002 (although apparently not available for defendant's review when he first saw plaintiff in September, 2004) showing a torn rotator cuff and plaintiff's claimed knowledge that such an injury could not have healed on its own, additional testing was superfluous.  Id.

The following of defendant's stated undisputed facts are supported by Endicott Dec., ¶ 5, and Pollara Dec., Ex. A, and not refuted or sufficiently addressed by plaintiff to raise a dispute: 11. Plaintiff returned to defendant on October 13, 2004.  12. He continued to complain of right shoulder pain.  13. Neither the M.R.I. nor the x-rays ordered by defendant in September, 2004, had been performed.

Plaintiff seeks to roundly dispute defendant's fact no. 14, citing Endicott Dec., ¶ 5; Pollara Dec., Ex. A., wherein defendant sets forth that he reviewed an M.R.I. from 2002, which he found inadequate to determine the cause of plaintiff's shoulder pain.  Plaintiff refers to a 2002 M.R.I. which he maintains was not inconclusive as asserted by defendant's expert Dr. Endicott, and which demonstrates that the M.R.I. ordered by defendant was unnecessary.  Opp., p. 3.  Plaintiff notes that defendant's counsel fails to include the 2002 M.R.I. as an exhibit with her declaration in support of the summary judgment motion; plaintiff also claims that he himself has enclosed a copy of the 2002 M.R.I. as part of his opposition.  Id.  However, no such report was attached to or submitted with plaintiff's opposition to the pending motion filed in this court. Nevertheless, the court was able to locate the exhibit, an unauthenticated copy of an M.R.I. report, dated September 6, 2002, as one of the exhibits (p. 19) plaintiff filed on September 13,

1   2005, docket entry no. 14, in support of his earlier motion for immediate injunctive relief.

2   Although not properly authenticated, defendant does not object in the reply to plaintiff's

3   reference to the 2002 M.R.I. on that, or any other basis.  See discussion below.

4          The following facts, wherein defendant relies on Endicott Dec, at ¶¶ 5-6, 9, and

5   Pollara Dec., Ex. A, are undisputed by plaintiff:  15. Defendant's physical examination of

6   plaintiff's right shoulder was unchanged [on plaintiff's October 13, 2004, return visit to

7   defendant] and defendant again requested that a right shoulder M.R.I .and x-rays be taken.

8   16.  Defendant also recommended plaintiff receive cardiac clearance prior to surgery because he

9   had a heart attack in 1998, he was taking significant medications and because of his age. 17.

10  Plaintiff returned to defendant's office on June 29, 2005.  18. He was seen by Ronnie Escudero,

11  defendant's physician's assistant.  19. Mr. Escudero noted plaintiff had last been seen in the

12  clinic, on October 14, 2004,[5] at which time he was recommended for cardiology clearance before

13  surgical intervention.  20. Plaintiff told Mr. Escudero he had obtained cardiology clearance

14  approximately two weeks before this visit.  21. Mr. Escudero noted an M.R.I. of the right

15  shoulder had been obtained November 5, 2004, which revealed an abnormal coracoacromial arch

16  with AC joint osteophytes and partial tears of the supraspinatus and subscapularis tendons.

17  22.  Mr. Escudero advised plaintiff he needed to follow up with a contracted orthopedic provider

18  for surgical intervention.  23. According to Dr. Endicott, plaintiff appropriately ordered an M.R.I.

19  and x-rays of plaintiff's right shoulder in September, 2004, when he first evaluated plaintiff in

20  order to determine the extent of damage to his shoulder.

21          At defendant's fact no. 24, defendant's expert, Dr. Endicott states

22  that defendant Dr. Williams reviewed an M.R.I. of plaintiff's right shoulder taken in 2002 during

23  his October 2004 examination but this M.R.I. was inconclusive.  MSJ, Endicott Dec. at ¶ 9.

24  Although, as noted, plaintiff's disputes that the report was "inconclusive," plaintiff does not

25  ────────────────

26      [5] As noted, the report actually mistakenly indicated that plaintiff had previously been seen
    on 10/14/05.

submit supporting expert testimony to this effect.  In the M.R.I. report the court located that was

dated September 6, 2002, and typed as signed by Karen Aderholdt, M.D., under "Clinical Data,"

the following is set forth: "ROTATOR CUFF TEAR RT. SHOULDER."  The exam indicates

that the M.R.I. was for "UPPER EXTREMITY JOINT - RIGHT."   Among the "FINDINGS,"

the report states:

> There is abnormal increased T2 signal present involving the distal
> aspect of the subscapularis tendon.  Portions of the tendon are not
> visualized.  There is thickening and heterogeneity effecting the
> distal 2 cm of the supraspinatus tendon, without evidence of focal
> disruption.  The infraspinatus and teres minor tendons are normal
> in signal intensity.

> Under "IMPRESSION," is listed:

> 1.  There is evidence of a complete tear of the subscapularis
> distally.
> 2.  There is moderate tendinopathy of the distal aspect of the
> supraspinatus tendon.
> 3.  Moderate osteoarthritis of the acromioclavicular joint.

While this report indicates that in 2002, an M.R.I. noted "evidence of a complete

tear of the subscapularis tendon distally," notwithstanding plaintiff's own belief that the M.R.I.

report (and the film that the report interprets, which defendant and apparently defendant's expert

reviewed) was sufficient in 2004 for defendant to proceed with surgery of the right shoulder

without any further or follow-up M.R.I., neither plaintiff nor this court has the requisite medical

expertise to interpret the report to support plaintiff's position.  Therefore, the court must find that

this fact is materially undisputed by plaintiff.

In fact no. 25, defendant's medical expert avers that without the appropriate films

defendant could not assess the extent of damage to plaintiff's shoulder and therefore could not

determine the appropriate treatment for his injury.  Endicott Dec., at ¶ 9.  Again, plaintiff seeks to

dispute this fact on the basis of his belief that the 2002 M.R.I. of his right shoulder was adequate

to provide the necessary information for defendant to perform the surgery in October, 2004.

Opp., p. 3; plaintiff's Dec., ¶ 4.  Plaintiff avers that the failure to perform the surgery at that time

1   subjected him to three more years of "excruciating shoulder pain."  Opp., plaintiff's Dec., ¶ 6.

2   (He also includes a reference to defendant's having subjected him to four more years of

3   "excruciating knee pain," id., but does not elsewhere reference or develop his claim with regard

4   to the left knee).  Plaintiff does not cite to his deposition testimony but this court, in reviewing

5   his deposition, has found that plaintiff testified therein that, inter alia, M.R.I.s had been done on

6   both shoulders which indicated a torn rotator cuff injury on both shoulders and that the left torn

7   rotator cuff was treated surgically within a few months in 2002 of the accident which caused  his

8   shoulder (and back) injuries in April, 2002.  Lodged plaintiff's deposition (Plt.'s Dep.): page 24:

9   lines 23- page 25: lines 1-8; (page) 30: (lines) 16-20; 33: 3-14; 37:1-17.  According to plaintiff,

10   he had a quick recovery from the left shoulder surgery with "excellent" results.  Plt.'s Dep.:

11   38:16-39:5.  According to plaintiff, the physician (not a party) who performed the left shoulder

12   surgery told him the injury to both shoulders "was almost identical."  Id., 39: 16-21.  Plaintiff

13   states that he has no complaint about the treatment of his right shoulder (or any other condition)

14   through 2003, even though he evidently did not receive surgery on that shoulder at RJ Donovan;

15   he was transferred out on January 26, 2004.  Id.: 43:4-10; 51:10-12.  Notwithstanding, plaintiff's

16   deposition testimony, he does not produce any expert evidence to support his claim that the

17   injuries to both shoulders were identical.  Moreover, plaintiff apparently has no complaint during

18   the period of more than a year following surgery on his left shoulder while he was at RJ Donovan

19   when he received no such surgical intervention for what he says was the virtually identical injury

20   on his right shoulder.  Plaintiff produces no expert testimony to show that an M.R.I. taken some

21   two years earlier of his right shoulder was adequate for defendant to proceed to operate without

22   further testing.

23         In his deposition, plaintiff references a 2004 M.R.I. that he says was taken in July,

24   2004, a few months before his first appointment with defendant, while plaintiff had been

25   incarcerated at California Men's Colony, and that defendant "was not happy with that" and

26   wanted a new one because "they change a lot."  Plt.'s Dep.: 73:4-15.  However, neither party

1    references this M.R.I., as far as can be discerned, in the motion or the opposition.  Even,

2    however, had this alleged M.R.I. been taken more closely in time than the one in 2002 to the one

3    taken that defendant ordered, plaintiff would still need expert evidence to demonstrate that taking

4    the additional M.R.I. in anticipation of surgery could somehow constitute deliberate indifference.

5               The following facts set forth by defendant are supported by MSJ, Endicott Dec.,

6    ¶¶ 9 -12.  26. Defendant had no way to control when these films would be obtained.  27. Dr.

7    Endicott is also of the opinion that defendant appropriately requested that plaintiff obtain

8    cardiology clearance prior to taking plaintiff to surgery.  28.  Plaintiff was taking various

9    medications when he was evaluated by Dr. Williams and is over the age of 50.  29. Right rotator

10   cuff repair surgery requires placing the patient under general anesthesia.  30. To place plaintiff

11   under general anesthesia without first obtaining medical clearance and obtaining an EKG would

12   have been a deviation of the standard of care and would have placed his life at risk.  31. If the

13   patient had additional cardiac history, i.e. heart attack, cardiac clearance would definitely be

14   required.  32. Given plaintiff's medical history it was entirely appropriate and within the standard

15   of care to require cardiac clearance before scheduling him for surgery.  33. It is also Dr.

16   Endicott's understanding that by the time plaintiff's workup had been completed, defendant was

17   no longer contracted with the California State Prison Cardiac system.  34. This does not

18   constitute a breach of the standard of care.  35. Therefore, it is Dr. Endicott's opinion all of

19   defendant Dr. Williams' care and treatment of plaintiff was within the standard of care for an

20   orthopedic surgeon practicing orthopedics and acting under similar circumstances.

21   _____Plaintiff, who declares that he is a physically disabled inmate enrolled in the

22   CDCR mental health program, in his opposition, as noted above, contends that defendant was

23   deliberately indifferent to plaintiff's serious medical needs by ordering an unnecessary new

24   M.R.I., as well as an expensive heart test thus delaying surgery on his right shoulder, and then

25   once the tests were completed, refused to perform the surgery unless his contract with the prison

26   was renewed, admitting to plaintiff that he needed to use plaintiff as leverage to extend his

1   contract.  Opp., plaintiff's Dec., ¶¶ 2, 4-5.  Thus, plaintiff avows that defendant's deliberate

2   indifference to plaintiff's medical needs caused plaintiff almost "3 more years of excruciating

3   shoulder pain, and over 4 more years of excruciating knee pain."  Id., at ¶ 6.

4           In his opposition, plaintiff provided no expert evidence supporting his allegation

5   that he was subjected to unnecessary tests.  In his deposition testimony, when asked the basis for

6   his allegation that defendant had ordered unnecessary tests, plaintiff responded that he based it

7   solely on his "personal experience" and "personal beliefs."  Plt.'s Dep. 83:11-16.  Plaintiff

8   contended in his deposition that he believed that the cardio test was not necessary because he

9   averred that several (unidentified) people involved in performing the cardio test expressed

10  surprise that he was undergoing such a test for arthroscopic shoulder surgery.  Id., 84:13-85:8.

11  Plaintiff also asserts that he did not have to undergo such a test in preparation for the surgery on

12  his right shoulder that he ultimately had on February 21, 2007, stating that he did have an EKG

13  prior to that surgery.  Id.: 89:12-90:10.  Plaintiff does indicate that post-surgery to his right

14  shoulder he no longer had pain in that shoulder.  Id.: 90:16-19.  On the other hand, plaintiff does

15  expressly state that he had a heart attack in 1998 and has a heart condition and that he takes

16  medication for his heart condition.  Id., 8:13-19; 16:7-10; 17:12-13; 71:22-25; 74:12-19.

17  Plaintiff also states that prior to the right shoulder surgery he ultimately received from a Dr.

18  Pompan in February, 2007, orthopedic doctors at U.C. Davis wanted another M.R.I., although he

19  expresses no complaint as to the procedure on that occasion.  Id: 88:25-89:25.

20          Although plaintiff believes that the tests he was compelled to undergo were

21  excessive, expensive and unnecessary, plaintiff does not provide the requisite expert testimony to

22  demonstrate that the arguable caution defendant showed in requiring the tests for which plaintiff,

23  who undisputedly has a heart condition, was over 50, and who would undisputedly have to

24  undergo general anesthesia for the surgery at issue, approaches anything like deliberate

25  indifference to a serious medical condition.  That defendant did not perform the surgery for

26  which he had ordered plaintiff to undergo an M.R.I. and cardio test, following completion of

16

1   tests, also does not rise to the level of deliberate indifference.  Defendant's expert states as an

2   undisputed fact that, at least to his understanding, defendant no longer had a contract with

3   California State Prison Cardiac system the CDCR at the time of completion of plaintiff's

4   workup.  Plaintiff does not provide evidence to refute that, indeed, plaintiff states in his

5   opposition that defendant used "plaintiff as a pawn in an attempt to get his contract with the

6   prison extended."  Opp., p. 2.  Although plaintiff provides no substantive evidence of this,

7   plaintiff's own representation indicates that any contract between defendant and the state prison

8   system was ending or at an end, after which, it is logically to be inferred that defendant could not

9   continue care of a patient that was under his care as a result of a contract.

10          Although the court does not doubt that plaintiff suffered pain as a result of

11  deferred surgery, plaintiff has not shown that defendant in ordering the tests he ordered or in the

12  tests not having yet been performed by plaintiff's second appointment with defendant less than a

13  month later constitutes deliberate indifference to plaintiff's medical needs.  Nor could defendant

14  be expected to perform surgery on plaintiff if, at the time, he no longer had a contractual

15  relationship with the CDCR.

16          Although plaintiff also contends that defendant was to treat his knee condition,

17  plaintiff did not sufficiently set forth in his amended complaint how defendant failed him in that

18  regard.  While it is true that defendant has based his dispositive motion on the gravamen of

19  plaintiff's allegations, that is on the lack of treatment of the right shoulder injury, and has not

20  addressed the left knee complaint, it is also true that plaintiff's reference to defendant's

21  unspecified failures with regard to the left knee treatment cannot be kept alive with one

22  unsupported allegation in the opposition that defendant's failure to treat the knee resulted in four

23  additional years of severe pain for plaintiff.  Plaintiff (Opp., pp. 1-2) takes issue with the court

24  for having simply expressed, in recommending denial of this defendant's motion to dismiss,[6] that

25  _____

26          [6] See, Findings and Recommendations, filed on 6/05/07, p. 7, adopted by Order, filed on 8/13/07.

1  on a motion for summary judgment, expert opinion will almost always be necessary for a

2  plaintiff to establish the necessary level of deliberate indifference, citing therein Hutchinson v.

3  United States, 838 F.2d 390, also cited supra.  However, although pro se plaintiff prisoners may

4  be at a disadvantage in having to present such expert evidence to withstand summary judgment

5  for defendants in cases alleging inadequate medical care, the failure to do so in such a case as this

6  signifies that plaintiff cannot show that this defendant's failure to provide the medical care

7  plaintiff sought from him even approached criminal recklessness.  Plaintiff's own difference of

8  opinion with defendant as to what the defendant should have done and the manner in which

9  defendant should have gone about providing care for plaintiff simply does not meet the standard

10  required to constitute an Eighth Amendment violation.  Jackson v. McIntosh, supra, 90 F.3d 330;

11  Franklin v. Oregon, supra, 662 F.2d 1337, 1344.

12          Accordingly, IT IS HEREBY ORDERED that defendant Bradley Williams

13  motion to compel discovery, filed on March 8, 2007, is vacated as moot.

14          IT IS RECOMMENDED that defendant Bradley Williams' motion for summary

15  judgment, filed on June 13, 2007, be granted, and this case be closed.

16          These findings and recommendations are submitted to the United States District

17  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

18  days after being served with these findings and recommendations, any party may file written

19  objections with the court and serve a copy on all parties.  Such a document should be captioned

20  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

21  shall be served and filed within ten days after service of the objections.  The parties are advised

22  that failure to file objections within the specified time may waive the right to appeal the District

23  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

24  DATED: 12/11/07

                                          /s/ Gregory G. Hollows

25                          _____

                                          UNITED STATES MAGISTRATE JUDGE

26  GGH:009 - cons1701.msj+